[No. B159267. Second Dist., Div. One. Dec. 16, 2003.]

EVEREST INVESTORS 8 et al., Plaintiffs and Appellants, v.
McNEIL PARTNERS et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part F.

## COUNSEL

Fainsbert Mase & Snyder, Dennis A. Kendig; Law Office of John A. Case, Jr., and John A. Case, Jr., for Plaintiffs and Appellants.

Browne & Woods, Eric M. George and Miles J. Feldman for Defendants and Respondents.

## OPINION

**MALLANO, J.**—A real estate limited partnership merges into a new entity, becoming a wholly owned subsidiary of the new entity. The interests of the limited partners are liquidated or cashed out, while the general partner retains an equity interest in the postmerger entity, which then sells the assets of the limited partnership to third parties for more than the assets were valued for purposes of the cashout and merger. Under those circumstances, we hold that a limited partner's claim against the general partner—that the merger transaction harms the limited partner by undervaluing its partnership interest or by depriving it of the future earnings and growth generated by the assets of the

limited partnership—is individual in nature. The claim is not derivative because it is not based on any injury to the limited partnership or its assets, both of which survive the merger transaction intact.

Accordingly, we reverse the summary judgment in favor of defendants because the trial court erroneously determined that the claims asserted by plaintiffs limited partners are not individual but derivative in nature, and because triable issues of fact exist with respect to the defense of the business judgment rule.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs[1] (referred to as Everest) are five California limited liability companies which held limited partnership interests in 14 public real estate limited partnerships (referred to as the McNeil Partnerships).[2] The McNeil Partnerships were all controlled by a general partner, defendant NcNeil Partners, L.P., and defendants related entities (referred to as general partner or McNeil).[3] Together the McNeil Partnerships owned about 81 real estate holdings, including commercial property, apartment buildings, multi-family units and self-storage properties. The general partner owned a small percentage of the equity interests in the McNeil Partnerships; the limited partners together owned a 95 percent interest in McNeil Real Estate Funds IX, X, XI, and XII; the limited partners together owned a 99 percent interest in McNeil Real Estate Funds XIV, XV, XX, XXI, XXII, XXIII, XXIV, XXV, XXVI, and XXVII.

---

[1] Plaintiffs are Everest Investors 8, Everest Investors 9, Everest Investors 12, Everest Management, and KM Investments.

[2] The 14 limited partnerships at issue in this case are: McNeil Real Estate Funds IX, McNeil Real Estate Funds X, McNeil Real Estate Funds XI, McNeil Real Estate Funds XII, McNeil Real Estate Funds XIV, McNeil Real Estate Funds XV, McNeil Real Estate Funds XX, McNeil Real Estate Funds XXI, McNeil Real Estate Funds XXII, McNeil Real Estate Funds XXIII, McNeil Real Estate Funds XXIV, McNeil Real Estate Funds XXV, McNeil Real Estate Funds XXVI, and McNeil Real Estate Funds XXVII. The limited partners in each of the McNeil Partnerships were not identical.

[3] Defendants are McNeil Partners, L.P., a Delaware limited partnership; McNeil Investors, Inc., a Delaware corporation; McNeil Real Estate Management, Inc., a Delaware corporation; and Robert A. McNeil.

The general partner in the McNeil Partnerships was McNeil Partners, a limited partnership. The general partner in McNeil Partners was McNeil Investors, Inc., the principal business of which was to act as general partner in McNeil Partners. Robert McNeil was the sole owner of McNeil Investors, Inc. Robert McNeil also owned a 25 percent limited partnership interest in McNeil Partners, with McNeil Investors, Inc. owning a 75 percent general partnership interest in McNeil Partners. McNeil Real Estate Management, Inc. (McREMI) was also wholly owned by Robert McNeil, and McREMI was the management company for the properties owned by the 14 McNeil Partnerships.

In 1991 and 1992 the McNeil Partnerships were restructured, and the general partner agreed to commence a liquidation of the partnership properties seven years after the restructuring date and to use reasonable efforts to complete the liquidation and termination of the McNeil Partnerships by December 31, 1999. In 1995, some of the limited partners of some of the McNeil Partnerships filed a class action lawsuit against Robert McNeil and the general partner alleging that they breached their fiduciary duties to the limited partners in various ways, including rendering the limited partner units highly illiquid, artificially depressing the prices available for limited partner units in private sales, by charging excessive management fees and by not selling the real estate holdings and distributing the proceeds to the limited partners.

In September 1998, the parties to the class action lawsuit (referred to as the *Schofield* action) entered into a "Stipulation of Settlement" of all derivative and class claims pursuant to which the general partner would provide the limited partners with over $35 million in cash distributions and would purportedly implement a fair and impartial bidding process, overseen by PaineWebber, Inc., "designed to obtain the maximum value in connection with the sale, as part of one transaction, of the [McNeil Partnerships] and the management assets owned by certain defendants [i.e., McREMI]."

Before the execution of the Stipulation of Settlement, the general partner had solicited bids and was then pursuing negotiations with the three highest bidders in order to finalize a transaction with the highest value. The Stipulation of Settlement set out the procedures for the sale of the McNeil Partnerships and the allocation of the net proceeds from such sale to the limited partners. The procedures set out in the Stipulation of Settlement included the following requirements: (1) that the plans for allocation of net proceeds be based upon arm's-length negotiations between the general partner and the limited partners, each side receiving advice and counsel from its own independent investment adviser; (2) that the limited partners retain an independent adviser to perform analyses of the partnership properties and management assets; and (3) that an independent investment adviser issue a fairness opinion that the proposed allocations are fair to the limited partners and the McNeil Partnerships from a financial point of view. The proposed plans for allocation of the proceeds of the sale were to be submitted to a vote of the limited partners of each McNeil Partnership.

In October 1998, the court in the *Schofield* action entered an order preliminarily approving the proposed settlement and providing that within a certain time period any member of the settlement class could "request exclusion from the class claims asserted in the Action," but that class members "cannot opt out of that portion of the Settlement which settles the

derivative claims asserted in the Action." It is undisputed that Everest opted out of the class claims asserted in the *Schofield* action.

In March 1999, Whitehall Street Real Estate (Whitehall) sent to McNeil an outline of a proposed transaction, offering to "discuss an all cash purchase of the Commercial Properties by Whitehall directly." But McNeil refused to consider it, responding that "[a]n asset deal does not work for us" and that McNeil wanted "to share the proceeds of sales as partners."

Whitehall then made a "Total all-or-None Bid" for the McNeil Partnerships and McREMI in the total amount of $644,440,000, which PaineWebber deemed to be the highest bid. The general partner negotiated with Whitehall on the "possibility of the McNeil affiliates receiving an equity interest in the special purpose acquisition entity," namely the entity created to receive the assets of the McNeil Partnerships. The Whitehall transaction ultimately resulted in a merger of the McNeil Partnerships with Whitehall, pursuant to which the interests of Everest and all other limited partners in the McNeil Partnerships were liquidated. McNeil received an equity interest in the postmerger entity of about 46 percent, an increase from the 1 or 5 percent interest which McNeil had owned in the McNeil Partnerships. According to the proxy statement prepared in connection with the merger, as a result of the transaction, "each participating McNeil Partnership will become a direct and/or indirect wholly owned subsidiary of WXI/McN Realty [the entity acquiring the McNeil Partnerships] . . . ."

In May 1999, the general partner set up an "independent special committee," comprised of a single individual, Paul Fay, Jr., an "independent director" on the general partner's board of directors, to negotiate the final terms and conditions of the transaction with Whitehall. Because the general partner and other McNeil affiliates would be acquiring an equity interest in the new entity created by the proposed transaction, the general partner's board of directors "determined that an independent special committee was necessary in light of the actual or potential conflicts of interest created by the acquisition by [McNeil] of equity in WXI/McN Realty as a result of the proposed transaction" and that the special committee was "to evaluate the transaction on behalf of the limited partners of the McNeil Partnerships."

Eastdil Realty Company was retained as the special committee's financial adviser. The McNeil Partnerships had previously, in January 1998, retained the investment banking firm Robert A. Stanger & Co. (Stanger) to render opinions as to the fairness of the consideration to be received by each of the McNeil Partnerships pursuant to a sale transaction. McNeil hired its own investment adviser, Houlihan Lokey Howard & Zukin Capital (Houlihan), to negotiate the terms of the merger and the final formula for allocation of the

proceeds of the transaction. The plaintiffs in the *Schofield* action, on behalf of the limited partners, retained the investment banking firm CFC Capital Corp. to review the analyses performed by Stanger and Houlihan and to advise Lawrence Kolker, counsel for the *Schofield* action plaintiffs, during the negotiation process. After several days of negotiations characterized by Kolker as "arms-length" and "difficult," the parties reached an agreement as to the material terms of the merger transaction. According to Kolker, "virtually every valuation and allocation dispute was resolved in favor of the [*Schofield*] Class [of limited partners]."

Under Stanger's analysis of the Whitehall transaction, the McNeil Partnerships' real estate assets had an aggregate value of approximately $601.5 million, and the value of McREMI was $35 million. Of the total consideration of $644.5 million generated by the transaction, the amount allocated to the limited partners' interests was $605.5 million. Stanger provided opinions that the following aspects of the merger transaction were fair and reasonable to the limited partners: (1) the aggregate consideration to be paid for McREMI, the limited partner interests and the general partner interests; (2) the allocation of the aggregate consideration between McREMI and the partnerships; (3) the per partnership allocated value; and (4) the methodology of the allocation. The "independent special committee" (namely Paul Fay) also concluded that Stanger's opinions were fair and reasonable and recommended the transaction to the limited partners.

On behalf of the plaintiffs in the *Schofield* action, CFC Capital Corp. agreed that the Stanger valuations and allocations were "well within a range of reasonableness" and that the valuation of McREMI reflected a conservative valuation "to the benefit of the limited partners." Kolker also agreed that the terms of the merger transaction "were resolved in a manner which is highly favorable to the Limited Partners" and recommended that the court approve the settlement.

Everest objected to the settlement. Nevertheless, the court in the *Schofield* action granted final approval of the settlement in July 1999 and entered a Final Order and Judgment authorizing the parties to consummate the settlement according to the terms of the Stipulation of Settlement and dismissing the action with prejudice. The Final Order and Judgment also provided that "there is no right to exclusion from the Settlement with respect to the derivative claims asserted in the Action" and that "each unitholder . . . who owned Units . . . during the Settlement Class Period, shall be bound by this Judgment and Settlement of the derivative claims in the Action regardless of whether or not any such persons timely and validly requested exclusion from the Settlement Class."

A July 1999 "Supplemental Stipulation of Settlement and Order" provided in pertinent part: "Nothing contained herein shall act as a release of unknown, future claims whether derivative or individual for acts of the General Partner occurring after the date upon which the Final Order and Judgment is signed by the Court [(on July 8, 1999)]."

In January 2000, the merger transaction with Whitehall was consummated after the proposed transaction was submitted to the limited partners for approval. In December 1999, the limited partners had received a detailed proxy statement, including a description of the proposed terms of the settlement, the plan of allocation, and the fairness opinions prepared by Stanger. According to McNeil, the limited partners voted to approve the merger transaction by a vote of 62 percent, but the evidence offered by McNeil shows only that the limited partners of McNeil Real Estate Fund XXVII approved the transaction. But Everest maintained that each McNeil Partnership voted separately and some rejected the merger.

Brandon Flaming, a vice-president of McREMI, stated that the merger transaction resulted in Everest recouping more than a 150 percent return on its investment in the McNeil Partnerships. Everest, however, asserted that the limited partners should have recouped a greater return on their investment. Everest discovered that Whitehall had projected before the consummation of the merger that it would be able to "flip" or resell the properties acquired in the transaction for more than the values they had been allocated in the settlement, and Whitehall admitted that it sold some of the acquired properties within a year of the merger for more money than it had paid for them. Whitehall itself had valued the assets of the McNeil Partnerships at over $668 million, assigning a value of $0 to McREMI.

In January 2001, Everest filed the instant action for breach of fiduciary duty, unfair competition, and constructive fraud. Everest alleged that defendants breached their fiduciary duties by engaging in wrongful actions which benefited themselves at the expense of the limited partners, causing Everest's return on its investments in the McNeil Partnerships to be 10 to 20 percent lower, representing a loss to Everest of about $3 million. (Later, Everest recalculated its damages as exceeding $7 million.) The wrongful actions of defendants, as alleged in the complaint, or asserted by Everest in interrogatories and in opposition to the summary judgment motion, include: (1) structuring the transaction as a merger of the entire group of McNeil Partnerships rather than conducting sales of each partnership's real estate holdings, resulting in a distribution to the limited partners of an amount less than the fair market value of an individual partnership; (2) allocating a portion of the settlement price ($35 million) to the management company controlled by Robert McNeil (McREMI), notwithstanding that McREMI possessed only

contracts that could be canceled on short-term notice and otherwise had no meaningful assets and no function other than to manage the real estate holdings for the McNeil Partnerships; (3) including in the transaction oppressive "break-up" fees of $18 million that were designed to deter competing offers from third parties or rejection of the deal by the limited partners; (4) requiring that the limited partners pay nearly $2 million in "success fees" to corporate insiders employed by McREMI; (5) structuring the transaction so that McNeil acquired an ownership interest in the postmerger entity, effectively constituting a sale of the McNeil Partnership assets to itself, giving it more incentive to value the assets for purposes of the merger at a lowball price, and allowing it to profit from the sale of the assets to third parties at higher prices, which it did, thus obtaining a benefit from the transaction which the limited partners could not share.

Everest claimed that had the transaction been conducted properly, the total distribution to the limited partners and the general partner would have been increased by $159 million (comprised of $31 million improperly allocated as the value of McREMI, $126 million in higher purchase prices, and $2 million in improperly allocated success fees), with the limited partners receiving 95 percent of that increase, or about $151 million. Everest's share of the increased distribution to the limited partners, or 4.5 percent, would have been approximately $7.1 million.

McNeil moved for summary judgment on two grounds: (1) that Everest's claims are derivative in nature and therefore barred because they were released pursuant to the judgment in the *Schofield* action and because Everest lacks standing to pursue the derivative claims; and (2) that Everest's claims are barred by application of the business judgment rule, by which the courts defer to the business decisions of managers whose actions are the product of negotiation, analysis, and approval of a disinterested special committee.

Everest opposed the motion, arguing as follows: Its action was individual or direct, and California law allows a limited partner to proceed directly against a general partner who breaches its fiduciary duty by misallocating proceeds among itself and the limited partners. In this situation, the action is direct and not derivative because the limited partners are harmed, but the general partner is not harmed, and the partnership as a whole is not harmed because its assets remain intact. The merger constituted a breach of fiduciary duty because it did not maximize the return to the limited partners in each individual McNeil Partnership, which would have occurred if the real estate holdings had been sold or liquidated on an individual basis. Because of the all-or-nothing aspect of the merger transaction, Whitehall had very little competition; the deal was structured "to eliminate buyers who could not finance an entire portfolio, and to eliminate buyers who want only a single property or property type (e.g., apartments),

and thereby drive away competition for the properties. . . . The result? A substantially lower total price for the partnerships' properties. . . . [¶] . . . Take, for example, the self-storage properties. In the Whitehall transaction, $35 million in value was attributed to the 8 self-storage properties in the portfolio [owned by McNeil Real Estate Funds XXVII]. Nonetheless, Whitehall sold all 8 of these properties to a single buyer for $42 million within weeks after the transaction closed, resulting in an immediate 20% profit."

With respect to the "business judgment rule," Everest contended that triable issues of material fact exist as to the applicability of the rule because of McNeil's conflicts of interest arising out of its increased equity ownership in the postmerger entity, facts which were admitted in the proxy statement sent to the limited partners in December 1999.

McNeil filed a reply, and after a hearing on the motion, the court granted summary judgment. The court's February 22, 2002 minute order provided in pertinent part that the motion was granted "as to all defendants on the ground that the claims are derivative in nature and are therefore barred by the Court's judgment in the *Schofield* action. Plaintiffs' interrogatory responses make clear that the types of wrongdoing alleged do not relate to a special duty owed to plaintiffs or have their origin in circumstances independent of plaintiffs' status as unitholders. *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 124 [84 Cal.Rptr.2d 753]. Rather, the types of wrongdoing alleged are 'incidental to an injury' to the entire partnership. [Citations.] [¶] Plaintiffs attempt to distinguish the case law relied upon by defendants on the ground that the cases do not involve partnerships; however, persuasive federal authority attached to defendants' reply indicates that there is no basis for a special rule governing limited partners' claims against general partners. [(*Mieuli v. DeBartolo* (N.D.Cal. May 7, 2001, No. C-00-3225 JCS), 2001 U.S.Dist. LEXIS 22519, 2001 WL 777091 at pp. * 5–* 7.)]"

Everest filed a timely notice of appeal from the April 9, 2002 judgment.[4] The principal issues presented are: (1) whether Everest's claims are barred on the ground that they are derivative in nature and seek recovery for injuries to the partnership entities, or whether the claims are actionable on the ground that they are individual or "direct" in nature and seek recovery for injuries sustained by Everest; and (2) even if the claims are individual, whether they are nevertheless barred under the business judgment rule.

---

[4] McNeil also prepared, and the judge signed, an 11-page order granting summary judgment which contains a detailed, though selective, factual background as well as five pages of legal analysis. Inasmuch as we review the record and the determination of the trial court de novo (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116]), we need not summarize the order.

The notice of appeal states that Everest also appeals from a January 29, 2002 order denying Everest's motion to set the discovery cutoff and deadline for expert witness disclosure. In the event that the summary judgment is reversed, Everest seeks to vacate a prior order cutting off discovery and precluding expert witness disclosure based on a previous March 20, 2002 trial date. Everest requests that on remand discovery should be reopened.

On this appeal, the parties do not dispute that any derivative claims sought to be asserted by Everest in this action are barred and that Everest can assert only claims that are properly classified as individual. Thus, the parties' disagreement concerns whether the nature of the claims asserted by Everest are derivative or individual.

## DISCUSSION

### A. *Standard of Review*

"A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The burden of persuasion remains with the party moving for summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 861 [107 Cal.Rptr.2d 841, 24 P.3d 493] . . . .)" (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002–1003 [4 Cal.Rptr.3d 103, 75 P.3d 30].) We review the record and the determination of the trial court de novo. (*Id.* at p. 1003.)

The general rule on summary judgment is that the evidence and the inferences reasonably to be drawn therefrom must be viewed in the light most favorable to the opposing party. (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 843.) And, when a motion for summary judgment includes a test as to whether the complaint states a viable claim, "the court will apply the rule applicable to demurrers and accept the allegations of the complaint as true," and we will also consider those matters subject to judicial notice. (*American Airlines, Inc. v. County of San Mateo* (1996) 12 Cal.4th 1110, 1118 [51 Cal.Rptr.2d 251, 912 P.2d 1198].)

Accordingly, considering Everest's allegations and accepting the facts offered by Everest and the reasonable inferences therefrom, our first task is to determine whether Everest's claims against McNeil are derivative or individual. In this case, that distinction involves a consideration of the nature of partnerships and the fiduciary obligations of general partners.

B. *Nature of Partnerships and Fiduciary Obligations of General Partners*

■ A partnership is an entity separate and apart from the partners of which it is comprised, and it is the partnership entity which owns its assets, not the partners. (*Evans v. Galardi* (1976) 16 Cal.3d 300, 307 [128 Cal.Rptr. 25, 546 P.2d 313] [limited partner has no property interest in specific partnership assets].) "California law treats a partnership as a 'hybrid' organization that is viewed as an aggregation of individuals for some purposes, and as an entity for others. (*Epstein v. Frank* (1981) 125 Cal.App.3d 111, 119 [177 Cal.Rptr. 831] . . . .) One of the primary areas in which a partnership is viewed as an entity is with respect to ownership of property. California Corporations Code section 15008 specifically provides that a partnership may hold title to real property . . . ." (*Bartlome v. State Farm Fire & Casualty Co.* (1989) 208 Cal.App.3d 1235, 1240 [256 Cal.Rptr. 719].)

■ Partnership is a fiduciary relationship, and partners are held to the standards and duties of a trustee in their dealings with each other. (*BT-I v. Equitable Life Assurance Society* (1999) 75 Cal.App.4th 1406, 1410 [89 Cal.Rptr.2d 811].) In proceedings connected with the conduct of a partnership, partners are bound to act in the highest good faith to their copartners and may not obtain any advantage over them in the partnership affairs by the slightest misrepresentation, concealment, threat or adverse pressure of any kind. (*Id.* at pp. 1410–1411.) A general partner of a limited partnership is subject to the same restrictions, and has the same liabilities to the partnership and to the other partners as in a general partnership. (*Id.* at p. 1411.) The fiduciary obligations of a general partner with respect to matters fundamentally related to the partnership business cannot be waived or contracted away in the partnership agreement. (*Id.* at pp. 1411–1412 [fiduciary duty not to purchase partnership debt and foreclose on one's partner cannot be contracted away in the partnership agreement].)

■ "There is an obvious and essential unfairness in one partner's attempted exploitation of a partnership opportunity for his own personal benefit and to the resulting detriment of his copartners." (*Leff v. Gunter* (1983) 33 Cal.3d 508, 514 [189 Cal.Rptr. 377, 658 P.2d 740].) Thus, a partner who seeks a business advantage over another partner bears the burden of showing complete good faith and fairness to the other. (*Laux v. Freed* (1960) 53 Cal.2d 512, 522 [2 Cal.Rptr. 265, 348 P.2d 873]; see also *Smith v. Tele-Communication, Inc.* (1982) 134 Cal.App.3d 338, 345 [184 Cal.Rptr. 571] (*Smith*) [fiduciary has burden of justifying conduct].) A partner's fiduciary duty extends to the dissolution and liquidation of partnership affairs, as well as to the sale by one partner to another of an interest in the partnership. (*Laux v. Freed, supra,* 53 Cal.2d at p. 522.) " 'A partner may not dissolve a partnership to gain the benefits of the business for himself, unless he fully

compensates his copartner for his share of the prospective business opportunity.' " (*Leff v. Gunter, supra,* 33 Cal.3d at p. 515.) Such a partnership opportunity may not be appropriated by one partner to the detriment of a copartner even after dissolution. (*Ibid.*)

In the corporate context, it has also been held that directors breach their fiduciary duty to minority stockholders by using their control of the company to obtain an advantage not available to all stockholders to the detriment of the minority stockholders and without a compelling business purpose for the directors' conduct. (*Fisher v. Pennsylvania Life Co.* (1977) 69 Cal.App.3d 506, 513 [138 Cal.Rptr. 181].) "Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority. Any use to which they put the corporation or their power to control the corporation must benefit all shareholders proportionately and must not conflict with the proper conduct of the corporation's business." (*Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 108 [81 Cal.Rptr. 592, 460 P.2d 464] (*Jones*).) " 'Self-dealing in whatever form it occurs should be handled with rough hands for what it is—dishonest dealing. And while it is often difficult to discover self-dealing in mergers, consolidations, sale of all the assets or dissolution and liquidation, the difficulty makes it even more imperative that the search be thorough and relentless.' " (*Id.* at p. 111.)

### C. *Derivative Versus Individual Actions*

■ An action is derivative, that is, in the corporate right, " 'if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets.' " (*Jones, supra,* 1 Cal.3d at p. 106.)

"The purpose of a limited partner's derivative action is to enforce a claim which the limited partnership possesses against others [including the general partners] but which the partnership refuses to enforce. [Citations.] Like a shareholder's derivative action, a limited partner's derivative suit is filed in the name of a limited partner, and the partnership is named as a defendant. Although a limited partner is named as the plaintiff, it is the limited partnership which derives the benefits of the action." (*Wallner v. Parry Professional Bldg., Ltd.* (1994) 22 Cal.App.4th 1446, 1449 [27 Cal.Rptr.2d 834] [under the California Uniform Limited Partnership Act, a limited partner may file a derivative action against general partners for self-dealing and breach of fiduciary duties by leasing partnership property to themselves without paying rent to partnership].)

Thus, where the wrongful acts of a majority shareholder amounted to misfeasance or negligence in managing the corporation's business, causing the business to lose earnings, profits, and opportunities, and causing the stock to be valueless, the court held that the claim was derivative and not individual because the resulting injury was to the corporation and the whole body of its stockholders. (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 125–127 [84 Cal.Rptr.2d 753] (*Nelson*).) In a case involving the fraudulent transfer of the assets of a limited liability company, without the payment of compensation to the company, a derivative, but not an individual, action was held to lie because the gravamen of the alleged wrongs was an injury to the company. (*PacLink Communications Internat., Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 964–965 [109 Cal.Rptr.2d 436] (*PacLink*) [diminution in the value of the members' 38 percent ownership interest was incidental to injury to company, which was improperly deprived of its assets].)

Similarly, the allegations by shareholders of a bank—that the bank directors breached their duties of care and loyalty by mismanaging operations and improperly placing the bank into voluntary receivership—described an injury to the bank and not to the individual shareholders. (*Pareto v. FDIC* (9th Cir. 1998) 139 F.3d 696, 699–700 (*Pareto*) [depreciation of stock value was an indirect result of injury to the bank and an injury that fell on every stockholder alike, whether majority or minority].)

In *Mieuli v. DeBartolo, supra,* 2001 U.S.Dist. LEXIS 22519, 2001 WL 777091 (*Mieuli*), the court, applying California law, held that cases applying the derivative versus individual distinction in the corporate context also applied in the context of a limited partnership and that the limited partner had not asserted an individual claim. The limited partner alleged that the general partner breached his fiduciary duty by converting partnership funds and engaging in other acts of mismanagement and self-dealing which damaged the limited partner by depriving him of partnership distributions and reducing the value of his interest in the partnership. (*Mieuli, supra,* at p. *2.) Interpreting plaintiff's allegations of mismanagement and self-dealing as tantamount to the assertion that, as a limited partner, he was injured "only indirectly through an injury to the partnership," the court concluded that such claims must be brought derivatively. (*Id.* at p. *23.)

On the other hand, California cases recognize that a stockholder's individual suit " 'is a suit to enforce a right against the corporation which the stockholder possesses as an individual.' " (*Jones, supra,* 1 Cal.3d at p. 107.) Jones, a seminal case, involved a complaint by a minority shareholder for breach of fiduciary duties by majority stockholders in a savings and loan association. The majority shareholders allegedly took advantage of a bull market to render their own stock more valuable and the minority shareholders' stock less valuable by creating a holding company, transferring their

control block of shares to the holding company, receiving a majority of the holding company shares, excluding the minority shareholders from participation in the holding company, and pledging the association's assets and earnings to secure the holding company's debt that had been incurred for the majority shareholders' own benefit. After the above actions had rendered the association stock unmarketable except to the holding company, the majority shareholders refused to either purchase the minority shareholder's stock at a fair price or exchange the stock for that of the holding company on the same basis afforded to the majority. (*Id.* at p. 105.)

The court in *Jones* concluded that the minority shareholder had asserted an individual (or nonderivative) action, reasoning that the plaintiff "does not seek to recover on behalf of the corporation for injury done to the corporation by defendants. Although she does allege that the value of her stock has been diminished by defendants' actions, she does not contend that the diminished value reflects an injury to the corporation and resultant depreciation in the value of the stock. Thus the gravamen of her cause of action is injury to herself and the other minority stockholders. [¶] . . . . The individual wrong necessary to support a suit by a shareholder need not be unique to that plaintiff. The same injury may affect a substantial number of shareholders. If the injury is not incidental to an injury to the corporation, an individual cause of action exists." (*Jones, supra,* 1 Cal.3d at p. 107, fn. omitted; see also *Crain v. Electronic Memories & Magnetics Corp.* (1975) 50 Cal.App.3d 509, 521–522 [123 Cal.Rptr. 419] (*Crain*) [individual action stated by minority shareholders where majority shareholders engaged in self-enriching activities which rendered worthless only the stock of the minority shareholders].)

*Jones* expressly disapproved of the articulation of the test in *Shaw v. Empire Savings & Loan Assn.* (1960) 186 Cal.App.2d 401, 407 [9 Cal.Rptr. 204] (*Shaw*), which required that a minority shareholder demonstrate that the injury to him was different from that suffered by other minority shareholders. (*Jones, supra,* 1 Cal.3d at pp. 107–108.) The Jones court stated that "[a]nalysis of the nature and purpose of a shareholder's derivative suit will demonstrate that the test, adopted in the *Shaw* case does not properly distinguish the cases in which an individual cause of action lies." (*Jones, supra,* 1 Cal.3d at p. 106.)

*Shaw* also stated in a one sentence dictum that a stockholder may maintain an individual action "where it appears that the injury resulted from the violation of some special duty owed the stockholder by the wrongdoer and having its origin in circumstances independent of the plaintiff's status as a stockholder," citing only Annotation (1945) 167 A.L.R. 285 [28 Cal.2d 525, 170 P.2d 898] as its authority. (*Shaw, supra,* 186 Cal.App.2d at p. 407, italics omitted.) Although the court in *Jones* did not specifically discuss the "special duty" language in *Shaw,* the test for an

individual action as articulated in *Jones* does not require that the wrongdoer owe the plaintiff a "special duty" independent of the stockholder relationship. We decline to follow *Shaw*'s dictum because it is inconsistent with *Jones*. We note that other appellate courts (as well as McNeil herein) have continued to cite *Shaw*'s "special duty" language. (See, e.g., *Rankin v. Frebank Co.* (1975) 47 Cal.App.3d 75, 95 [121 Cal.Rptr. 348]; *Nelson, supra,* 72 Cal.App.4th at p. 124 [citing *Rankin*].)

Nor in an individual action must a plaintiff sue on behalf of all minority shareholders or limited partners, or must all minority shareholders or limited partners assert the same claim. In *Low v. Wheeler* (1962) 207 Cal.App.2d 477 [24 Cal.Rptr. 538], a case which predates *Jones*, the court affirmed a judgment in favor of the plaintiff minority shareholder where the other minority shareholders had signed releases to the defendants as part of the sale of their stock. The court stated that the defendants "cannot be heard to complain that the other two [minority shareholders] were not parties, for if they had been successful parties, the judgment would have been larger." (*Low v. Wheeler, supra,* 207 Cal.App.2d at p. 483; see also *Nelson, supra,* 72 Cal.App.4th at p. 127.)

Following the test in *Jones*, the court in *Smith, supra,* 134 Cal.App.3d 338, held that a minority shareholder in a subsidiary asserted an individual cause of action for fraud and breach of fiduciary duty against directors of the subsidiary and the parent corporation, when the defendants allegedly had manipulated a consolidated tax procedure to afford increased tax benefits to the corporations, which resulted in a decreased distributive share to the plaintiff upon a sale of the assets of the subsidiary. The court concluded that "[h]ere, it is clear that Smith does not seek to recover on behalf of Crystal Brite [(the subsidiary)]. He does not contend that the diminishment in his share of the assets reflects an injury to Crystal Brite and a resultant depreciation in the value of its stock. As in [*Jones*], the gravamen of the causes of action is injury to Smith as the only minority shareholder. Smith suffered sufficient injury to bring this action in his individual capacity." (*Smith, supra,* 134 Cal.App.3d at p. 343.)

■ In sum, a limited partner may suffer an injury to its interest without the occurrence of any injury to the partnership entity or to the partnership assets because the interest of a limited partner in a partnership is separate and apart from the partnership's ownership interest in its assets.

### D. *Everest's Claims Are Individual, Not Derivative*

■ Applying the foregoing principles, we conclude that the gravamen of the claims asserted by Everest is an injury only to the interests of the limited

partners and not to the interests of the general partner or to the McNeil Partnerships. Everest asserts that McNeil used its management and control of the McNeil Partnerships to structure a merger transaction which afforded benefits and opportunities for itself from which the limited partners were excluded. McNeil allegedly breached its fiduciary duties by, among other things, appropriating for itself the opportunity to acquire an equity interest in the postmerger entity. Thus, as the assets of the McNeil Partnerships were sold to third parties for more than the value assigned to those assets when the limited partners' interests were cashed out, McNeil was able to enjoy a greater value or return on its investment than the limited partners.

Under Everest's claims, the merger transaction did not constitute an injury to the McNeil Partnerships or to the general partner, or result in a diminution in value of the assets of the McNeil Partnerships because the McNeil Partnerships and their assets survived the merger transaction intact and therefore the NcNeil Partnerships suffered no harm by the merger transaction. On the other hand, when, soon after the merger, the assets of the McNeil Partnerships were sold to third parties for amounts more than the values they had been assigned for purposes of the merger and cashout, harm to the limited partners' interests became evident. Either the McNeil Partnerships were worth more than the values assigned to them for purposes of the merger and cashout, or the partnerships' real estate holdings had appreciated in value after the merger. In the first instance, Everest would be injured by the undervaluation of the McNeil Partnerships; in the second instance, Everest would be injured by its exclusion from partnership opportunities (an equity interest in the postmerger entity or a share of the proceeds from subsequent sales of the real estate holdings) which McNeil arrogated unto itself. We conclude that the circumstances here are analogous to those in *Jones*, *Smith*, and *Crain* and distinguishable from the circumstances in *Nelson*, *PacLink*, *Mieuli*, and *Pareto*. As a matter of law, Everest's claims are individual in nature and not derivative. The trial court erred in granting summary judgment on the ground that the claims were derivative.[5]

### E. *Business Judgment Rule*

McNeil argues that the business judgment rule is an independent ground on which summary judgment can be affirmed.

█ The business judgment rule is a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions. (*Lee v. Interinsurance Exchange*

---

[5] We do not reach the issue, and express no opinion, as to whether all of the items of damages sought by Everest are recoverable in an individual, as opposed to a derivative, action.

(1996) 50 Cal.App.4th 694, 711 [57 Cal.Rptr.2d 798].) "The rule is based on the premise that those to whom the management of a business organization has been entrusted, and not the courts, are best able to judge whether a particular act or transaction is helpful to the conduct of the organization's affairs or expedient for the attainment of its purposes. [Citations.] The rule establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest." (*Ibid.*) An exception to this presumption exists in circumstances which inherently raise an inference of conflict of interest. (*Id.* at p. 715.) The business judgment rule does not shield actions taken without reasonable inquiry, with improper motives, or as a result of a conflict of interest. (*Ibid.*)

 We agree with Everest that triable issues of fact as to the existence of McNeil's improper motives and a conflict of interest preclude summary judgment based on the business judgment rule. The proxy statement identified the following conflicts of interest involved in the merger transaction: "[McNeil], including some members of the McNeil Investors board of directors, have interests in the transaction or relationships, including those referred to below, that may present actual or potential conflicts of interests in connection with the transaction. . . . [¶] . . . The transaction provides some benefits to [McNeil] that may be in conflict with the benefits provided to the limited partners of the McNeil Partnerships. . . . The transaction also provides some benefits to [McNeil] that are not provided to the limited partners of the McNeil Partnerships. [McNeil] had an economic interest, separate from that of the limited partners, in structuring the transaction to achieve these benefits. [¶] For example, McNeil Partners [6] will receive a significant, although non-controlling, equity interest in WXI/McN Realty [(the postmerger entity)] if the transaction is completed."

The proxy statement also acknowledged that upon completion of the transaction McNeil Partners would receive membership interests in the postmerger entity and credit for a capital contribution in the amount equal to approximately $65 million. As structured, the transaction also allowed McNeil to make contributions to the postmerger entity on a tax-deferred basis and the partners of McNeil Partners to defer substantial income tax liability. "If the transaction had been structured as an acquisition of the entire McNeil portfolio for cash, it is estimated by Arthur Andersen LLP that the partners of McNeil Partners would have been required to pay approximately $30,563,000 in taxes in connection with the transaction. The transaction, as structured, will

---

[6] See footnote 3, *ante*. The general partner of McNeil Partners was McNeil Investors, Inc., whose sole owner was Robert McNeil. Robert McNeil individually owned a 25 percent interest in McNeil Partners, and McNeil Investors, Inc. owned a 75 percent interest in McNeil Partners.

permit the partners of McNeil Partners to defer this tax liability until such time as the properties currently owned by the McNeil Partnerships are sold or until such time as McNeil Partners disposes of its equity interest in WXI/McN Realty."

The proxy statements were sent to the limited partners in December 1999, *after* the July 1999 final judgment in the *Schofield* action. And, Everest points to events subsequent to July 1999 which give rise to an inference of the existence of a conflict of interest, including the postmerger sale of the self-storage properties for more than the value assigned to them when the limited partners' interests were cashed out. Accordingly, even though the July 1999 final judgment in the *Schofield* action provides that the settlement "is hereby approved by this Court as fair, reasonable and adequate to the Settlement Class . . . and the Partnerships," and even though various individuals in the *Schofield* action offered fairness opinions regarding the transaction, those findings and opinions were based on a different set of facts and circumstances than are presented in this record. Because triable issues of fact exist regarding McNeil's conflict of interest, summary judgment cannot be upheld based on the business judgment rule.

McNeil argues that "[e]ven if Everest could overcome the rule's presumption with specific factual evidence [regarding a conflict of interest], the business judgment rule bars Everest's suit based on McNeil's 'good faith and reasonable investigation.' " McNeil essentially maintains that its reliance on the special committee and the professional opinions of other business experts regarding the fairness of the merger transaction constitutes a separate defense to Everest's action, apart from the business judgment rule. Yet McNeil cites no pertinent authority to support the proposition that such reliance constitutes a defense to claims of breach of fiduciary duty and constructive fraud in the context of an *individual* action.[7]

---

[7] McNeil concedes that "California has not expressly extended the business judgment rule to conduct approved by a special committee," but only to conduct approved by a special *litigation* committee. The special litigation committee defense "arises out of the interplay between the business judgment rule and the requirement in a stockholder's derivative action that the plaintiff must have made a demand on the board of directors to have the corporation pursue the action. (See Corp. Code, § 800, subd. (b)(2).) Thus, it has been held that, once a duly appointed committee of disinterested directors reasonably determines that it is not in the best interests of the corporation to pursue the claims asserted in the derivative action, that decision is protected by the business judgment rule. The trial court must determine, as a matter of fact, whether the committee members were disinterested and whether they conducted an adequate investigation. If it answers yes to both questions, however, it must dismiss the derivative action." (*Finley v. Superior Court* (2000) 80 Cal.App.4th 1152, 1158 [96 Cal.Rptr.2d 128].)

McNeil intimates that a general partner can delegate or contract away to a special committee or other business experts those fiduciary duties owed by a general partner to a limited partner. No authority is cited for this proposition.

In *Finley v. Superior Court, supra,* 80 Cal.App.4th 1152, a derivative action, the court held that the special litigation committee defense is a valid defense in California (*id.* at p. 1158), but that " 'judicial review of the independence, good faith, and investigative techniques of a special litigation committee is governed by traditional summary judgment standards.' " (*Id.* at pp. 1160–1161; see also *Desaigoudar v. Meyercord* (2003) 108 Cal.App.4th 173, 190 [133 Cal.Rptr.2d 408] [if a trial court detects a factual dispute concerning the independence of the special litigation committee or the adequacy of its investigation, the case may not be dismissed short of trial].)

■ Even if we assume, without deciding, that McNeil can assert a defense based on a good faith and reasonable investigation, we would conclude that triable issues of fact exist as to this issue as well. "[T]he business judgment rule protecting the directors' decision does not apply in the case of bad faith or fraud. The purpose of the court's inquiry into the independence of the committee members and the adequacy of their investigation is to uncover the existence of circumstances that would preclude application of the rule. [Citation.] ' "The policy reasons for keeping a court from evaluating after the fact the wisdom of a particular business decision do not apply when the issue is whether a party to that decision acted fraudulently or in bad faith. The assessment of fraud or bad faith is a function courts are accustomed to perform, and in performing it the courts do not intrude upon the process of business decisionmaking beyond assuring that those decisions are not improperly motivated.' " (*Desaigoudar v. Meyercord, supra,* 108 Cal.App.4th at p. 188.) On this record, triable issues of fact exist regarding whether McNeil was motivated by conflicts of interest and whether the merger transaction was preceded by a good faith and reasonable investigation into whether the merger transaction was in the best interests of the limited partners. Accordingly, summary judgment cannot be upheld based on the theory that McNeil conducted a good faith and reasonable investigation.

F. *January 29, 2002 Order**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

* See footnote, *ante,* page 411.

## DISPOSITION

The summary judgment is reversed. The January 29, 2002 order denying further discovery and designation of experts is vacated. Everest is entitled to costs on appeal.

Spencer, P. J., and Ortega, J., concurred.

Respondents' petition for review by the Supreme Court was denied March 17, 2004. George, C. J., and Brown, J., did not participate therein.