Filed 6/23/14  Kyle v. Genter CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BRIAN KYLE et al., | |
| Plaintiffs and Respondents, | G049008 |
| v. | (Super. Ct. No. 30-2013-00626727) |
| ROCKY W. GENTNER, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, John C. Gastelum, Judge.  Affirmed.

Law Office of Richard J. Foster and Richard J. Foster for Defendant and Appellant.

Jasper & Jasper, Stuart P. Jasper and Catherine R. Jasper for Plaintiffs and Respondents.

# INTRODUCTION

Rocky Gentner has appealed from an order striking three causes of action from his cross-complaint against respondents Brian Kyle, Bobbie Griffith, and Cindy Atkinson under Code of Civil Procedure section 425.16, the anti-SLAPP statute.[1] The dispute involves a piece of property they own through a limited liability company, Bay City Partners, LLC (Bay City). The City of Seal Beach (the City) had its eye on part of the property for an access road and sewer maintenance area. Both sides filed lawsuits, which were settled after the City agreed, among other things, to pay Bay City $1.1 million out of redevelopment agency funds for part of the property and to try to convince the city council to approve permits for 48 residential lots on the rest of it.

As it turned out, the City lost its redevelopment agency funds, and its planning commission recommended permits for 32 lots instead of 48. At a meeting with City representatives in June 2011, the Bay City member in attendance was told, in no uncertain terms, that unless the company waived the $1.1 million payment, the City would not approve permits for the proposed residential development. Faced with this choice, the Bay City members signed a modification of the prior settlement agreement with the City, deleting the $1.1 million payment.

Gentner then sued respondents, alleging that the Bay City members met with the City at a "secret meeting," of which he had no notice, and that by meeting in secret, respondents breached several duties to him when they orally committed Bay City to agree to the waiver and the reduced number of lots without his approval. Respondents filed an anti-SLAPP motion against the three causes of action based on breach. The trial court granted the motion, and Gentner has appealed.

---

[1] "The acronym SLAPP was coined by Professors Penelope Canan and George W. Pring. (See generally Canan & Pring, *Strategic Lawsuits Against Public Participation* (1988) 35 Soc. Probs. 506.)" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 85, fn. 1.) It alludes to "nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue." (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 235.) All further statutory references are to the Code of Civil Procedure.

We affirm the trial court's order striking the three causes of action. Respondents established that the causes of action arose from protected activity, and Gentner did not carry his burden to show a probability of prevailing on any of them.

**FACTS**

Bay City is a limited liability company formed in 2000 by Kyle, Griffith, Gentner, James Parkhurst, and Thomas Atkinson. All of the members were managing members. Bay City's sole asset was a 10-acre parcel of undeveloped beachfront property in Seal Beach, the last such parcel in the city. When Bay City acquired it in 2003, the property was zoned for commercial use; the company began the process of getting the property rezoned for residences. Among other things, Bay City proposed to subdivide the property into 48 residential lots.

Thomas Atkinson died in 2006, and since that time, the Bay City members have disagreed about the status of his widow, Cindy Atkinson (Atkinson). Kyle, Griffith, and Atkinson herself asserted that she succeeded to her husband's membership, with full voting rights. Gentner and James Parkhurst contended that she has only an economic interest in the company, but cannot vote.[2]

In 2009, the City filed an eminent domain action against Bay City in order to acquire part of the property for an access road and sewer maintenance area. Bay City then sued the City for CEQA violations. Both actions settled in March 2011, with all members of Bay City except Gentner signing the settlement agreement.

---

[2] This dispute ultimately resulted in respondents filing a complaint in January 2013, to wind up the company and declare Atkinson's rights under the Bay City operating agreement.

3

The settlement agreement provided, among other things, that if the City approved the project and the California Coastal Commission issued the necessary coastal development permit, the City would pay Bay City $1.1 million in exchange for a portion of the property to be used for open space. The City also agreed to use its best efforts to get planning commission approval of the 48-lot residential development, although there were no guaranties.

On June 6, 2012, the City's planning commission issued its recommendation to the city council for the Bay City project: 32 lots, not 48. On June 11, three Bay City members, along with two other company representatives, met with two members of the city council and other City staff members to discuss the implications of the planning commission recommendation, particularly in light of the "best efforts" provision of the settlement agreement. Gentner and Atkinson did not attend the meeting. The June 11 meeting resulted in two options for Bay City, either of which the two council members undertook to support when the project came up for approval before the whole council.

On June 20, the Bay City members received an e-mail notifying them that the City wanted to get out of paying the $1.1 million agreed to in the settlement agreement, because it no longer had the redevelopment agency funds to make the payment. On June 22, Kyle attended a meeting with the same two council members who had met with Bay City on June 11. This time the council members stated unequivocally that unless Bay City waived the $1.1 million payment, they would not vote to approve the project. If Bay City waived the payment, the council members would vote for it and would line up some environmental groups to support the project with the Coastal Commission.[3]

---

[3] Evidently some opposition to the project had developed, such that Bay City was anticipating litigation or an initiative to stop it. The council members opined that with the environmental groups supporting the project, the opposition would wither.

4

The next day, Bay City's project manager reported to all members by e-mail about meeting on June 22. In the e-mail, he stated, "Since Jim [Parkhurst] and Bob [Griffith] are out of town at this critical point in the project [and] Jim is virtually unreachable it was not possible to agree to anything yesterday." He further outlined the plans for the next several weeks: "1. Monday June 25th – City Council to approve project as presented. [Council member] Ellery will add a condition that project approval to be conditioned on waiving the $1.1m[illion payment]. We neither agree or object to this condition. [¶] 2. Wednesday June 27th – [Bay City members] to meet and decide three [*sic*] on issues raised above. I have invited Dennis O'Neil to join us. Bob [Griffith] will have to call in to participate by telephone. [¶] 3. Thursday June 28th to July 5th – Revision to Settlement Agreement (now in the form of a DDA (Disposition and Development Agreement)) is drafted if [Bay City] agrees to 1 and 2 above.[4] A DDA is being proposed by the city because it is a public document approved at a public meeting and will give better optics to the public as being a more transparent process."

The e-mail also spelled out to the members the consequences of their decision at the June 27 meeting. "a. If [Bay City] agrees to 1 and 2 above Second reading and DDA approval will be done. [¶] b. If [Bay City] does not agree to 1 and 2 above: [¶] i. Council will deny project and we go back to step one. [¶] ii. Council will continue project for further discussion/negotiation. [¶] c. If continued, as a practical matter, nothing will happen until after Labor Day as [two council members] are on vacation during August." Thus the issue for the June 27 meeting of the members boiled down to "whether not waiving the $1.1m[illion payment] is worth jeopardizing project approval or losing our momentum." On June 25, 2012, at a public meeting, the city council voted to approve the Bay City project with 32 lots, with the vote for final approval on July 9.

---

[4] "1 and 2 above" refers to (1) the waiver of the $1.1 million payment and (2) sharing the cost of defense between Bay City and the City in the event of an initiative or legal challenge to the project.

5

The Bay City members met on June 27, at which time the project manager drove home the message in the June 23 e-mail: if they did not agree to waive the $1.1 million payment, the city council would not approve the project.[5] The members duly voted to approve the waiver and later signed the DDA prepared by the City to reflect this change in the settlement agreement.[6]

On July 9, 2012, the city council voted to approve the zoning change, the general plan amendment, the tentative tract map (for 32 lots), and the DDA, with approval of the zoning change conditioned on Bay City's execution of the DDA.

In March 2013, Gentner cross-complained against Kyle, Griffith, and Atkinson for breach of the Bay City operating agreement, for breach of fiduciary duty, for declaratory relief, and for negligence. The centerpiece of the cross-complaint was an allegedly secret meeting with City representatives in June 2012 at which respondents orally committed Bay Cities to agree to waive the $1.1 million payment and to reduce the number of residential lots from 48 to 32, without notice to Gentner or his approval. Gentner's cross-complaint did not specify the date of the meeting and alleged that only one council member attended it. He alleged the secret oral agreement was later reduced to a writing (the DDA), which he signed under duress and protest.

---

[5] The minutes of the city council meeting of July 9 confirm the bad news: "The City Council discussed the final revised specific plan and indicated that final Council approval is dependent on Bay City Partners fully executing and Disposition and Development Agreement."

[6] Atkinson did not attend the June 27 meeting and did not vote on the waiver. We express no opinion as to whether she was properly excluded.

Respondents moved the court to strike the three breach causes of action under the anti-SLAPP statute.  The trial court granted the motion, striking all causes of action from the cross-complaint except for declaratory relief.  The trial court found that the causes of action arose from protected activity – an issue under review by the city council – and that Gentner had not presented sufficient evidence to meet his burden on the probability of his prevailing.  Among the deficiencies in this department, the trial court cited the lack of evidence of damages resulting from the allegedly wrongful conduct.

## DISCUSSION

The California Legislature enacted the anti-SLAPP statute to counteract "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).)  The Legislature created a special motion to strike, filed at the outset of litigation, to nip these suits in the bud, before defendants incurred crippling attorney fees and other expenses.  (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 65.)  A court may order a cause of action "arising from any act . . . in furtherance of the . . . right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" to be stricken by means of this special motion.  (§ 425.16, subd. (b)(1).)  We review the order granting or denying an anti-SLAPP motion de novo.  (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.)

The trial court uses a two-part test to evaluate an anti-SLAPP motion.  First, the court determines whether the complaint or cause of action is "one arising from protected activity." (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 88.)  As our Supreme Court has emphasized, "[T]he critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity."  (*Id*. at p. 89.)

7

The Legislature has exhorted the courts to construe the anti-SLAPP statute "broadly." (§ 425.16, subd. (a).)

The defendant bears the burden of showing that the cause of action arises from protected activity. (*Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 67.) If the defendant makes that showing, the court then proceeds to the second part of the inquiry: whether it is probable that the plaintiff will prevail on the claim. The plaintiff need not prove its claim, but it must produce enough evidence to establish a prima facie case. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.)

"'In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant [citation]; though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. [Citation.]' [Citations.] [¶] . . . [A]lthough by its terms section 425.16, subdivision (b)(1) calls upon a court to determine whether 'the plaintiff has established that there is a *probability* that the plaintiff will prevail on the claim' (italics added), past cases interpreting this provision establish that the Legislature did not intend that a court . . . would weigh conflicting evidence to determine whether it is more probable than not that plaintiff will prevail on the claim, but rather intended to establish a summary-judgment-like procedure . . . ." (*Taus v. Loftus* (2007) 40 Cal.4th 683, 714.)

## I.          Protected Activity

Respondents' anti-SLAPP motion was made under section 425.16, subdivision (e), which defines "an act in furtherance of a person's right of petition or free speech . . . in connection with a public issue" to include "(2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body . . ." Although Gentner disputed the issue in his opposition to the motion, and disputes it on appeal as well, it is apparent from the record

that he is suing respondents for statements made in connection with issues under consideration by the City, that is, securing the City's approval of the Bay City real estate project and modifying the settlement agreement as a condition of that approval.[7] The alleged oral agreement, on which Gentner bases his breach of respondents' contractual and fiduciary duties, directly implicated both of these issues, as did the subsequent DDA. (See *M.F. Farming Co. v. Couch Distributing Co., Inc.* (2012) 207 Cal.App.4th 180, 194-195 [causes of action arose from filing false site plans in connection with city approval of development project]; *Midland Pacific Building Corp. v. King* (2007) 157 Cal.App.4th 264 [breach of contract cause of action arose from submitting map to planning commission and city council]. Respondents met their burden to show the cross-complaint was based on an act in furtherance of their right of petition or free speech in connection with a public issue.

## II.        Probability of Prevailing

Genter alleged three causes of action against respondents: breach of contract, breach of fiduciary duty, and negligence. A cause of action for breach of contract requires a plaintiff to plead and prove the existence of a contract, plaintiff's performance or an excuse for non-performance, defendant's breach, and proximately caused damages. (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1489.) The elements of a cause of action for breach of fiduciary duty are the existence of the duty, a breach, and resulting damage. (*Pelligrini v. Weiss* (2008) 165 Cal.App.4th 515, 524.) A negligence cause of action requires pleading and proof of a duty of due care, a breach of that duty, and proximately caused injury. (*Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1335.) All three causes of action require proof of proximately caused damages.

---

[7]        In his opposition to the anti-SLAPP motion, Gentner acknowledged that his causes of action "are based on the fact that [respondents] entered into a secret agreement with the City on behalf of [Bay City]" and "the subject matter of the agreement was under review by the City at the time."

Gentner's emphasis on the secrecy of the alleged meeting between respondents and the City is something of a red herring. Secrecy matters – that is, caused damages – only if things would have been different had there been no secrecy. Gentner presented no evidence that his presence at any meeting with the City would have made the slightest difference in the outcome. Therefore he was not damaged by the mere fact a meeting was held without notice to him, even if it actually was.[8]

If Gentner was damaged, it was because the City renegotiated its promise to pay Bay City $1.1 million and, possibly, because the number of lots in the proposed development was reduced from 48 to 32.[9] He claims respondents breached the operating agreement, their fiduciary duty, and their duty of care by orally agreeing to modify the settlement agreement in these ways. When the oral agreement was later reduced to writing, in the DDA, Gentner claimed he was presented with a fait accompli and had no choice but to sign.

As to the number of lots, the 2011 settlement agreement did not guarantee that Bay City would receive permits for all 48. In fact, it expressly stated the City could *not* guarantee approval of the entire project as proposed. Genter presented no evidence that the number of lots was reduced because of an agreement, secret or otherwise, with anyone from Bay City.[10] The City's planning commission determined the number it would recommend for approval and informed Bay City of its decision in early June at a public meeting. Bay City then submitted a revised tentative tract conforming to the

---

[8] Whether the meeting – whenever it took place – was properly noticed is an issue we need not address or decide.

[9] Although the lots were fewer in number, they were larger. It is by no means certain, therefore, that Bay City would have made less money from their sale.

[10] According to a City staff agenda report, prepared for the June 25 council meeting, Bay City submitted a revised tract plan after the June 6 planning commission meeting during which the commission stated it would recommend 32 lots instead of 48. Nothing indicates that anyone at Bay City entered into an agreement with the City to make this reduction. The revised plan appears simply to represent bowing to the inevitable. The June 6 planning commission meeting was a public meeting, not a secret one.

recommendation.  Nothing suggests the commission sought Bay City's approval for the reduction beforehand.

As for waiving the $1.1 million payment, the City held all the cards.  If respondents did not agree, the City would not approve development of the property.[11] Gentner presented no evidence that his presence at any meeting with the City could have affected the way things turned out.  Thus whether respondents and the City held a secret meeting, as opposed to one Gentner knew about, had no proximate relationship to the loss of the $1.1 million.[12]

Genter cannot prevail on any cause of action based on entering into the waiver agreement itself, because, as he has admitted, the members voted to authorize the waiver at a duly called membership meeting on June 27, which he attended.  Even if Gentner's agreement was coerced and should be disregarded, the majority of the members present at the June 27 meeting approved the waiver; according to the operating agreement, "the act of a majority of Members present at any meeting at which there is a quorum . . . shall be the act of the Members."[13]  Gentner presented no evidence to suggest the members agreed to the DDA for any reason other than to save the project from

---

[11] The settlement agreement provided that if the City did not approve Bay City's residential project, the City would have no obligation to pay the company $1.1 million and could acquire part of the property in eminent domain without objection by Bay City.

[12] It is also worth pointing out that Gentner presented no evidence of a secret meeting between anyone from Bay City and someone from the City at which Bay City agreed to anything.  If he means the meeting on June 22, the e-mail of June 23 makes it clear that no agreement was made, because certain members were unavailable.  At the public meeting on June 25, at which the execution of the DDA was officially made a condition of project approval, Bay City would "neither agree or object to this condition."  According to the evidence before the trial court, no agreement among the Bay City members to accept the City's waiver condition was reached until they met on June 27.

[13] A quorum for the transaction of business is "a majority of Members present, in person or by proxy."

11

oblivion.[14]   He has failed to present evidence showing a probability of prevailing on any of his causes of action based on a breach.

## DISPOSITION

The order granting the anti-SLAPP motion and striking the three causes of action from the cross-complaint is affirmed.  Respondents are to recover their costs on appeal.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


MOORE, J.

---

[14] If Gentner is challenging this decision itself – leaving aside any question of secrecy – he runs into the business judgment rule, "which insulates from court intervention those management decisions which are made by directors in good faith in what directors believe is the organization's best interest." (*Berg & Berg Enterprises v. Boyle* (2009) 178 Cal.App.4th 1020, 1045.)  Gentner presented no evidence at all of any fraud or bad faith on respondents' part that would serve to negate the business judgment rule. (See *Everest Investors 8 v. McNeil Partners* (2003) 114 Cal.App.4th 411, 432 [business judgment rule does not apply in the case of fraud or bad faith].)