[No. G041738. Fourth Dist., Div. Three. June 11, 2010.]

ALAN KRUSS, Plaintiff and Appellant, v.
JESS RAE BOOTH et al., Defendants and Respondents.

## COUNSEL

Glancy Binkow & Goldberg, Lionel Z. Glancy, Neal A. Dublinsky, Jala A. Amsellem and Kara M. Wolke for Plaintiff and Appellant.

Fredman Lieberman, Marc A. Lieberman and Alan W. Forsley for Defendants and Respondents Jess Rae Booth, Walter Carlson, Glenn Easterbrook and James Kangas.

Kaufman, Borgeest & Ryan, Jeffrey S. Whittington and Nicholas W. Sarris for Defendant and Respondent The Estate of Larry S. Poland.

## OPINION

**SILLS, P. J.**—As we explain anon, plaintiff in this difficult shareholder derivative suit must be given leave to amend his second amended complaint so as to allege violations of director fiduciary duty under California law. Plaintiff had alleged violations of California law in his prior, first amended complaint, but the trial court—erroneously as we show below—thought the case was governed entirely by Nevada law and required plaintiff to plead violations of Nevada law in the second amended complaint.

But then, even though plaintiff had alleged violations of fiduciary duty under Nevada law, the trial court dismissed the suit anyway. The court reasoned that none of the alleged violations of fiduciary duty took place when plaintiff owned stock in the subject company.

As we explain below, that was error too. The second amended complaint (all the complaints for that matter) alleged self-dealing on the part of defendant directors that continued into the period when plaintiff did own stock in the company.

Hence, the judgment of dismissal must be reversed. Plaintiff will have leave to amend to allege violations of fiduciary duty under California law. And, as one might expect, neither California law nor Nevada law permits corporate directors to engage in the complicated scheme of self-dealing alleged to have occurred in this case.

## I. SUMMARY

### A. Pumps and Dumps and Reverse Mergers

This case involves the arcane world of the capital markets, and there is no avoiding what are alleged to be some very convoluted facts indeed. A little background is therefore helpful.

Two basic ideas must be explained right off the bat. The first idea is that of the "reverse merger." A reverse merger is a kind of cheap alternative to an "initial public offering" (usually abbreviated as an IPO) as a way to raise capital by selling stock in an existing corporation. (See generally Pavkov, *Ghouls and Godsends? A Critique of "Reverse Merger" Policy* (2006) 3.2 Berkeley Bus. L.J. 475 (hereinafter *Ghouls, Godsends and Reverse Mergers*).) The basic idea is that you take an existing, nonpublic company and merge it into a public "shell" company whose main asset is the very fact that it *is* a public company.[1] Investors buy stock in the public company that is now the avatar of the old nonpublic company.

The second idea is the securities scam known as a "pump and dump" scheme. A pump and dump scheme is simple in outline: Make claims that artificially inflate ("pump up") the value of stock you own. Gullible investors then buy the stock at inflated prices. You sell high and bug out with the inflated difference in value. (See generally *U.S. v. Zolp* (9th Cir. 2007) 479 F.3d 715, 717, fn. 1 [" 'Pump and dump' schemes 'involve the touting of a company's stock (typically microcap companies) through false and misleading statements to the marketplace. After pumping the stock, fraudsters make huge profits by selling their cheap stock into the market.' "].)

---

[1] Explains the article: "A reverse merger, like an initial public offering, is a transaction whereby a private company may become a public corporation with full access to the public capital markets. Prior to such a transaction, two separate entities exist: a private entity that desires to be public and a public company that usually has no ongoing operations or assets other than cash and cash equivalents." (*Ghouls, Godsends and Reverse Mergers, supra*, 3.2 Berkeley Bus. L.J. at p. 478; see also *U.S. Securities and Exchange Commission v. Surgilight* (M.D.Fla. Oct. 15, 2002, No. 6:02-CV-00431-GKS-KRS) 2002 WL 31619081, p. *1, fn. 1 ["In a reverse merger, a privately-held company merges with a publicly-held 'shell' company, thereby rendering the privately-held company's stock publicly tradeable."].)

Besides being an excellent primer on reverse mergers, the article seeks a balanced perspective, noting that reverse mergers, on the one hand, pose dangers to investors, but, on the other, serve a legitimate purpose of allowing smaller and midcap companies access to public capital markets.

## B. Overview

### 1. The Variation on a Pump and Dump . . .

The second amended complaint alleges a clever variation on a pump and dump scheme. In this variation, the overinflated stock wasn't, strictly speaking, dumped. Rather, instead of selling the stock, defendant corporate directors were alleged to have transferred assets *out* of the company into which plaintiff investor had bought stock, *to* their own, privately held companies, and also transferred liabilities *into* the company *from* their own privately held companies. The effect, of course, was the same as a classic pump and dump: Wealth was transferred from investors in a public company to promoters.

The scheme was made easier because the private companies that were the ultimate recipients of the investors' wealth were in the same business (aluminosilicate products) as the public company. As alleged in the second amended complaint, the new public company was squeezed: It had to buy raw materials from three mining companies (to which the directors allegedly held allegiance) and also had to pay intellectual property royalties to another company (again, one in which the directors allegedly had a beneficial interest).

### 2. . . . Using a Reverse Merger

But, complications abound. The company on whose behalf this shareholder derivative suit has been brought (VitroTech) was formed in a reverse merger, yet much of the legwork for the pump and dump *scheme* antedated that reverse merger, that is, before VitroTech came into being.

According to the complaint, here's what happened: There was a private company *Hi*-Tech. Hi-Tech is technically separate from *Vitro*Tech, but easily confused with it because VitroTech would absorb some assets of Hi-Tech.

Anyway, *Hi*-Tech had substantial assets, including intellectual property rights, in the aluminosilicate products industry.

Then there was another company, Star. Star had the advantage of being an existing public company, though it did not have much in the way of assets.

Now, here's an interesting twist: In the reverse merger, Star did *not* swallow up Hi-Tech. Hi-Tech would survive as a separate company. But publicly traded Star *did* become the owner of some of privately held Hi-Tech's most valuable assets in a reverse merger. The newly swollen publicly traded Star then renamed itself as VitroTech.

Despite the infusion of capital, the new public company, Star yclept VitroTech, was doomed from the beginning: In the process of the reverse merger, public Star obligated itself to three privately held mining companies owned or controlled by its new board members, and also obligated itself to its old privately held "parent" company Hi-Tech. And guess who privately owned or otherwise had allegiances to the privately held mining companies and privately held Hi-Tech? The four defendant directors of the new publicly held VitroTech.

Hence, the money raised in the reverse merger for the purpose of capitalizing the new publicly held VitroTech flowed out again to the mining companies or Hi-Tech, all owned or controlled by VitroTech's self-dealing board members.

The trial court looked at this schemata and said, in effect, to plaintiff: All the bad stuff happened before you owned stock in the new public company, so you can't bring a shareholder derivative suit.

But that was error. Some of the bad stuff—self-dealing is the more precise legal phrase—*continued* on after the new public company was formed. This self-dealing included not even trying to renegotiate onerous minimum requirement contracts with the three mining companies, assuming $14.5 million of the still privately held parent company's debt, not making sure all the assets due from the reverse merger were transferred, approving amendments to mining contracts that gave the parent company and the mining companies stock in exchange for allegedly valueless or near valueless royalty concessions, and—most easily comprehended of all—paying twice as much as necessary to acquire a milling facility from the parent company. As we also explain below, this self-dealing was a breach of fiduciary duty, regardless of whether California law or Nevada law applied.

## II. THE PLEADINGS

We apologize for any repetition of the basic facts stated above in the following recounting of the pleadings, but sometimes it pays to look at shell games in slow motion.

In 2006, plaintiff Alan Kruss filed an original complaint for breach of fiduciary duty and related causes of action against a group of defendants consisting of the corporate officers who assumed positions at VitroTech, the new company that emerged out of a reverse merger that took place in February 2004.

To simplify the history of the corporation: Beginning in 2001 (and continuing to the reverse merger in Feb. 2004), there was a thinly traded

public shell company based in Sunset Beach, California, known as Star Computing (Star), which did not have much in the way of assets or sales. Star was incorporated in Nevada.

During the same period, there was another company, albeit a private one, known as Hi-Tech, also a Nevada company. Hi-Tech was and is a real company in the business of producing the mineral aluminosilicate for sale to real manufacturers, like paint manufacturers, who need it in the production of their own products. At the time of the reverse merger, Hi-Tech spun off from itself another entity, Vitro*Co*.[2] In this spinoff, Hi-Tech transferred both assets and liabilities to its offspring VitroCo.

The assets included the exclusive rights to purchase, process and sell some 35 billion pounds of "rare amorphous aluminosilicate"[3] in Calaveras and Kern Counties. That aluminosilicate could be manufactured into several products, including vitro*lite,* vitro*purge*, and vitro*cote* (italics added to emphasize distinction from Vitro*Tech* and Vitro*Co*),[4] which can be used in the painting and plastic molding industries.

The liabilities included a requirement that VitroCo pay its creator, Hi-Tech, royalties based on how much vitrolite was sold. Additionally, VitroCo was also required to pay royalties to three mining companies under a minimum purchase agreement with those companies. (Much of the complaint is a variation on the theme that the liabilities and obligations with which VitroCo was saddled doomed the company from the beginning.)

At the same time (Feb. 2004), yet another company was created in the reverse merger, Vitro*Tech*. In the reverse merger, Vitro*Tech* ostensibly purchased Vitro*Co* from Hi-Tech. Thus Vitro*Tech* effectively took on the assets and liabilities of Vitro*Co*. The reverse merger was completed when Vitro-Tech, pregnant with VitroCo, was in turn swallowed up by publicly traded Star, and, lest the movement of the shells be any easier to spot than absolutely necessary, Star then promptly changed its name to VitroTech. VitroTech was now a publicly traded company in which investors like plaintiff Kruss could purchase shares.[5] And promptly lose their money.

In September 2006, Kruss, on behalf of himself and other similarly situated investors, filed his original complaint, styled as both a derivative and

---

[2] Italics added to differentiate the company from Vitro*Tech*.

[3] Amorphous aluminosilicate is a mineral made up of aluminium, silicon, and oxygen which, like glass and coal but unlike salt (which is crystalline), has a molecular structure with no specific shape.

[4] The products are capitalized in the complaint, but we use lowercase to distinguish them from the "Vitro" corporate entities, VitroTech and VitroCo.

[5] We hope we have done justice to the circumstances of the birth of VitroTech as told in the original complaint (also later in a first and second amended complaint). We are mindful,

double-derivative suit. The "double-derivative" part was because the only real value of VitroTech was the kernel inside it, VitroCo.

Three of the defendants had ties either to Hi-Tech—to which, remember, the freshly born VitroTech was obligated by way of royalties—or to one of the three mining companies, to which VitroTech was also obligated by way of a minimum purchase agreement.

Things went downhill for VitroTech from the beginning, given its obligations. Its demise was hastened by sweetheart deals made thereafter with Hi-Tech and the three mining companies (that is, sweet for Hi-Tech and the mining companies, rather bitter for VitroTech).

The original complaint did not specify which jurisdiction's law should apply. The choice of law issue was soon tested in a demurrer to the original complaint brought by defendant James Roth.[6] The trial court sustained the demurrer, albeit *with* leave to amend. The trial court also observed that plaintiff had neither pled nor "established" the "requirements" of section 2115 of the Corporations Code.[7] (To interject a thought and get ahead of ourselves for a moment: Section 2115 is the California statute which specifies when, if ever, California law should apply to certain internal affairs of an out-of-state corporation. We will explain it in more detail in pt. III.A. of this opinion. Precisely how one would go about "establishing" the "requirements" of § 2115 on demurrer is, as it turns out, highly problematic. The trial court appears to have been under the impression that Kruss had to *prove* the elements of § 2115 on demurrer. While that's possible in theory [tax returns might make the issue beyond peradventure], § 2115 is fact intensive, and therefore sometimes not readily susceptible to being "established" on demurrer.)

The trial court's observation prompted a motion for judgment on the pleadings from a group of four different defendants. These are the defendants who remain in the case in this appeal. We will refer to them as the "four defendant directors."[8]

The motion for judgment on the pleadings was based on the theory that Nevada law requires "intentional misconduct, fraud or a knowing violation of

---

however, that it might be easy to err in some of the details—as the first amended complaint would later say, "The reverse merger concluded in a shroud of mystery."

[6] Roth would later be dismissed from the suit.

[7] All undesignated statutory references in this opinion are to the Corporations Code.

[8] Jess Rae Booth, CEO of VitroTech from February 2004 to September 2004; Walter Carlson, VitroTech's vice-president of research and development until July 2005; James Kangas, who was "at all relevant times" vice-president of sales; and Glenn Easterbrook, who replaced Booth as CEO of VitroTech, and apparently remained so until its current dormancy.

law" to hold directors liable to shareholders.[9] Thus—as the motion argued— even if dumb business decisions might arguably have been made by the directors of VitroTech after its emergence from the reverse merger, there were no allegations of actual intentional misconduct, fraud or knowing a violation of law lodged against those directors. In a word, at least according to the motion, everything was covered by the business judgment rule.

In early 2008 the trial court granted the motion for judgment on the pleadings. The trial court noted that there had been no amendment to the complaint since the demurrer and in the context of the hearing on that

---

[9] Nevada Revised Statute section 78.138 provides:

"1. Directors and officers shall exercise their powers in good faith and with a view to the interests of the corporation.

"2. In performing their respective duties, directors and officers are entitled to rely on information, opinions, reports, books of account or statements, including financial statements and other financial data, that are prepared or presented by:

"(a) One or more directors, officers or employees of the corporation reasonably believed to be reliable and competent in the matters prepared or presented;

"(b) Counsel, public accountants, financial advisers, valuation advisers, investment bankers or other persons as to matters reasonably believed to be within the preparer's or presenter's professional or expert competence; or

"(c) A committee on which the director or officer relying thereon does not serve, established in accordance with NRS 78.125, as to matters within the committee's designated authority and matters on which the committee is reasonably believed to merit confidence, but a director or officer is not entitled to rely on such information, opinions, reports, books of account or statements if he has knowledge concerning the matter in question that would cause reliance thereon to be unwarranted.

"3. Directors and officers, in deciding upon matters of business, are presumed to act in good faith, on an informed basis and with a view to the interests of the corporation.

"4. Directors and officers, in exercising their respective powers with a view to the interests of the corporation, may consider:

"(a) The interests of the corporation's employees, suppliers, creditors and customers;

"(b) The economy of the State and Nation;

"(c) The interests of the community and of society; and

"(d) The long-term as well as short-term interests of the corporation and its stockholders, including the possibility that these interests may be best served by the continued independence of the corporation.

"5. Directors and officers are not required to consider the effect of a proposed corporate action upon any particular group having an interest in the corporation as a dominant factor.

"6. The provisions of subsections 4 and 5 do not create or authorize any causes of action against the corporation or its directors or officers.

"7. Except as otherwise provided in NRS 35.230, 90.660, 91.250, 452.200, 452.270, 668.045 and 694A.030, or unless the articles of incorporation or an amendment thereto, in each case filed on or after October 1, 2003, provide for greater individual liability, *a director or officer is not individually liable to the corporation or its stockholders or creditors for any damages as a result of any act or failure to act in his capacity as a director or officer unless it is proven that*:

"(a) His act or failure to act constituted a breach of his fiduciary duties as a director or officer; *and*

"(b) His breach of those duties *involved intentional misconduct, fraud or a knowing violation of law*." (Italics added.)

demurrer the court had made its comment about the applicability of Nevada law. Thus, the trial court considered Kruss to have "admitted that Nevada law applies." The trial court then agreed that "intentional misconduct, fraud, or a knowing violation of law" was required, and went on to opine that Kruss, as plaintiff, had the "burden to both plead and prove facts" to get around the business judgment rule, which burden he hadn't carried. The court then noted there were no "allegations that Defendants were self-dealing or lacked good faith."

The trial court's order, however, did not explicitly preclude leave to amend. So, two months later, Kruss debuted his first amended complaint. The first amended complaint made these points: The four defendant directors who had filed the motion for judgment on the pleadings[10] paid themselves disproportionate salaries in relation to the company's sales; in the period 1999 through 2004, the four defendant directors misrepresented facts about *Hi-Tech* to make it appear more profitable than it was. And during that period defendants disseminated brochures, newsletters, updates and staff reports all to that effect. In particular, defendant Easterbrook was alleged to have made a number of outright false statements about Hi-Tech's prospects and sales at a meeting at a Newport Beach hotel in *2001*. There was also a circular in April of 2003 that wrongly inflated amounts of vitrolite that were being sold. Thus defendants allegedly "contrived" the reverse merger to "pump and dump" their equity interests in Hi-Tech.

*Post*merger allegations included these:

(1) There was an October 2004 amendment to a mining contract with the mining companies (to whom at least two of the directors, Booth and Kangas, had interests or allegiances) that was "inordinately favorable" to both Hi-Tech and the mining companies. This amendment "validated" an "onerous royalty schedule" previously put in place at the time of the reverse merger, while also diluting the interests of the regular shareholders by giving Hi-Tech some 17 million VitroTech shares.

(2) Also in October 2004, CEO Booth had VitroTech transfer to him personally (or to entities controlled by him) certain of VitroTech's (or VitroCo's) assets, including intellectual property interests in the mines and unspecified "real property assets."

(3) Further, in early 2005, Booth received a cash bond securing VitroTech's permit to mine at a certain mine. This permit, however, allegedly limited the amount of vitrolite that could be obtained from that mine.

(4) And in June of 2005 matters reached a "crescendo" when the mining companies controlled by Booth and "his allies" claimed that VitroTech had

---

[10] Booth, Carlson, Easterbrook and Kangas.

defaulted on its obligations to them, allowing them to claim ownership of VitroTech's (and VitroCo's) "few remaining valuable assets, such as their rights to obtain minerals from the mines."

The first amended complaint alleged that VitroTech was subject to California internal corporate affairs law. The theory was that Star, the public shell that ostensibly morphed into VitroTech, was incorporated in August 2001, and filed *California* tax returns for the income year 2002 but did not file any Nevada tax returns for that year. Further, the 2002 tax return recited that Larry Poland, a California resident, owned 67 percent of Star's stock. Besides that, the complaint alleged all of the operations of all the relevant companies (presumably including Hi-Tech) were in California.

The first amended complaint was attacked via a demurrer. In July 2008, the demurrer was sustained *with* leave to amend. Judge Sundvold, who would later hear the demurrer on the second amended complaint as well, opined, among other things, that: (1) no "double-derivative" suits are allowed in California; (2) Kruss had *still* not gotten around the business judgment rule because he hadn't alleged "particularized facts" to overcome the rule's burden; and (3) Nevada law still applied because "50% of the shareholders reside outside of California." (For the final of these determinations, the trial court relied on SEC (Securities and Exchange Commission) filings of which it took judicial notice.)

The demurrer sent Kruss one more time into the breach. That is, in late August, he filed a second amended complaint. Basically, the second amended complaint was more of the same, except it explicitly pegged its legal theories to *Nevada* law, including breaches of fiduciary duty (Nev. Rev. Stats. § 78.138, the one quoted in the margin above that requires intentional misconduct, fraud or a knowing violation of law) and self-dealing (Nev. Rev. Stats. § 78.140).[11]

---

[11] Nevada Revised Statutes section 78.140 provides:

"1. A contract or other transaction is not void or voidable solely because:

"(a) The contract or transaction is between a corporation and:

"(1) One or more of its directors or officers; or

"(2) Another corporation, firm or association in which one or more of its directors or officers are directors or officers or are financially interested;

"(b) A common or interested director or officer:

"(1) Is present at the meeting of the board of directors or a committee thereof which authorizes or approves the contract or transaction; or

"(2) Joins in the signing of a written consent which authorizes or approves the contract or transaction pursuant to subsection 2 of NRS 78.315; or

"(c) The vote or votes of a common or interested director are counted for the purpose of authorizing or approving the contract or transaction, if one of the circumstances specified in subsection 2 exists.

"2. The circumstances in which a contract or other transaction is not void or voidable pursuant to subsection 1 are:

The second amended complaint had also grown in girth, now expanding to more than 70 pages and 296 paragraphs.

This time, the inevitable demurrer had a dispositive effect. In an order made in late December 2008, the trial judge sustained the demurrer, but this time *without* leave to amend. The court reasoned, among other things:

(1) Nevada law applied;

(2) Kruss could not rely on any facts alleged to have occurred prior to February 3, 2004 (the date of the reverse merger), because Kruss was not a shareholder, and the four defendant directors were not directors, prior to that date;

(3) Kruss had failed to "both plead and prove particularized facts to circumvent the business judgment rule's presumption" (and thus the matter was "proper" to be determined by demurrer);

(4) there were insufficient allegations that the four defendant directors "were self-dealing or lacked good faith"; and

"(a) The fact of the common directorship, office or financial interest is known to the board of directors or committee, and the board or committee authorizes, approves or ratifies the contract or transaction in good faith by a vote sufficient for the purpose without counting the vote or votes of the common or interested director or directors.

"(b) The fact of the common directorship, office or financial interest is known to the stockholders, and they approve or ratify the contract or transaction in good faith by a majority vote of stockholders holding a majority of the voting power. The votes of the common or interested directors or officers must be counted in any such vote of stockholders.

"(c) The fact of the common directorship, office or financial interest is not known to the director or officer at the time the transaction is brought before the board of directors of the corporation for action.

"(d) The contract or transaction is fair as to the corporation at the time it is authorized or approved.

"3. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or a committee thereof which authorizes, approves or ratifies a contract or transaction, and if the votes of the common or interested directors are not counted at the meeting, then a majority of the disinterested directors may authorize, approve or ratify a contract or transaction.

"4. The fact that the vote or votes of the common or interested director or directors are not counted for purposes of subsection 2 does not prohibit any authorization, approval or ratification of a contract or transaction to be given by written consent pursuant to subsection 2 of NRS 78.315, regardless of whether the common or interested director signs such written consent or abstains in writing from providing consent.

"5. Unless otherwise provided in the articles of incorporation or the bylaws, the board of directors, without regard to personal interest, may establish the compensation of directors for services in any capacity. If the board of directors establishes the compensation of directors pursuant to this subsection, such compensation is presumed to be fair to the corporation unless proven unfair by a preponderance of the evidence."

(5) Kruss had failed to "plead facts showing intentional misconduct, fraud or knowing violation of law."

The formal *order* sustaining the demurrer was filed on December 23, 2008, but notice of entry of the order was served January 5, 2009. On precisely the 60th day thereafter, Kruss filed the notice of appeal that has brought the case to this court.[12]

## III. THE CHOICE OF LAW ISSUE: CALIFORNIA OR NEVADA? FOR THE MOMENT, CALIFORNIA

### A. Issue Waived? No

We first tackle the argument that Kruss waived the right to assert an error as to the choice of law question. The argument goes like this: Kruss did not amend his complaint within 60 days after the trial court commented, in a minute order in connection with the demurrer to the original complaint, that Nevada law applies. Ergo, the matter became final and Kruss has waived the issue in this appeal.

█ The argument fails because orders sustaining demurrers with leave are not res judicata, collateral estoppel, law of the case, or any other claim- or issue-precluding disposition. Even now, on appeal, Kruss retains the power to propose an amendment alleging California law applies.[13] And, indeed, Kruss's attorney explicitly so requested such an amendment at oral argument.

---

[12] Cutting it a bit close? Not really. No *judgment* of dismissal appears in the record. Technically, that makes the appeal *premature*. In such cases, where the *order* sustaining a demurrer without leave to amend disposes of all causes of action, the better course is for the Court of Appeal to deem the order sustaining the demurrer to *incorporate* a judgment of dismissal, and proceed with the merits of the appeal. (E.g., *Melton v. Boustred* (2010) 183 Cal.App.4th 521, 527–528, fn. 1 [107 Cal.Rptr.3d 481] ["We treat the order as appealable, despite the absence of a judgment of dismissal. The general rule of appealability is this: 'An order sustaining a demurrer without leave to amend is not appealable, and an appeal is proper only after entry of a dismissal on such an order.' . . . But 'when the trial court has sustained a demurrer to all of the complaint's causes of action, appellate courts may deem the order to incorporate a judgment of dismissal, since all that is left to make the order appealable is the formality of the entry of a dismissal order or judgment.' . . . That is the case here. 'We will accordingly deem the order on the demurrer to incorporate a judgment of dismissal and will review the order.' " (citations omitted)].)

[13] (See *Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1035 [100 Cal.Rptr.3d 875] ["Where a demurrer is sustained without leave to amend, the reviewing court must determine whether there is a reasonable probability that the complaint could have been amended to cure the defect; if so, it will conclude that the trial court abused its discretion by denying the plaintiff leave to amend."]; *People ex rel. Brown v. Powerex Corp.* (2007) 153 Cal.App.4th 93, 112 [62 Cal.Rptr.3d 638] ["A party may propose amendments on appeal where a demurrer has been sustained, in order to show that the trial court abused its discretion in denying leave to amend."]; see also Code Civ. Proc., § 472c, subd. (a) ["When any court

*Cano v. Glover* (2006) 143 Cal.App.4th 326, 330 [48 Cal.Rptr.3d 871], relied on by the four defendant directors, is readily distinguishable.[14]

## B. Section 2115

### 1. *The Problem of Determining the Applicability of Section 2115 on Demurrer*

As we show in part III.B.2. (the next part) below, the question of whether certain internal affairs of an out-of-state corporation should—under criteria set out in section 2115—be governed by California corporate internal affairs law depends on several fact-intensive inquiries (such as the amount of sales in this state, the payroll in this state, and the property held in this state). And yet in this case it appears that the four defendant directors of VitroTech have attempted to try the issue of the applicability of section 2115 by judicial notice, mostly by asking the trial court to take judicial notice of filings *by VitroTech's own management* with the SEC.

■ What's wrong with this picture? This case was still in the demurrer stage when the trial court dismissed it. And the basic rule on demurrer is: *The court, trial and appellate, accepts all facts alleged in the complaint as true, and draws all reasonable inferences from those facts in favor of the plaintiff.*

To be sure, a plaintiff may be stuck with factual admissions made in previous complaints or made by the plaintiff in other documents of which a court could take judicial notice, but here—what are those admissions by plaintiff? Plaintiff Kruss has never contradicted his basic allegation, made in

makes an order sustaining a demurrer without leave to amend the question as to whether or not such court abused its discretion in making such an order is open on appeal even though no request to amend such pleading was made."].)

[14] In *Cano*, a demurrer was sustained with leave to amend to a complaint that named two persons. The plaintiff, however, forgot to name one of those persons in the amended complaint. That lucky person made a motion to dismiss *with* prejudice, but all he got was an order dismissing without prejudice. But then the lucky person appealed from that order, and more luck came his way: The appellate court agreed with him. In an opinion that is largely a gloss on section 581, subdivision (f) of the Code of Civil Procedure (" 'The court may dismiss the complaint as to' " a defendant " 'after a demurrer to the complaint is sustained with leave to amend,' " if " 'the plaintiff fails to amend within the time allowed by the court and either party moves for dismissal, italics omitted' "), the *Cano* court reasoned that because a plaintiff's right to voluntary dismissal " 'is cut off as of the moment there is a ruling which effectively disposes of the case,' " the statute gave the defendant the *right* to obtain a court order dismissing him with prejudice " 'after the expiration of the time to amend." (*Cano v. Glover, supra,* 143 Cal.App.4th at pp. 329-330.) In the present case, we do not deal with any issue involving failure to amend within the allotted time to re-add a defendant. The choice of law is a legal issue, and the trial court's observation was only that—an observation which, at most, explained the trial court's conclusion in support of sustaining the demurrer *with* leave to amend.

the first amended complaint, that in 2002 more than half of Star's voting shareholders lived in California and all of its business was conducted here.[15] At most, the second amended complaint merely included Nevada *legal authority*—as distinct from California legal authority—to support the basic set of facts alleged.

We mention the problem for this reason: As we show below, based on the facts alleged and that can still be realleged, section 2115 does indeed apply. That is, *for the moment*, we must look to California law.

*But*—we emphasize: The very attempt, on demurrer, to decide the applicability of section 2115 based on information (SEC filings) outside of the complaint is rife with the potential for anomaly: One jurisdiction's law (here, California's) might readily apply based on facts alleged in a complaint, but another jurisdiction's law (here, Nevada's) might *yet* apply, based on facts determined later in the litigation, say on a motion for summary adjudication or in a phased or bifurcated trial. The reason: The tests the Legislature articulated in section 2115 are highly fact intensive.

Thus, it may very well be that, in a future motion for summary adjudication, facts will be shown to be undisputed (or in a future bifurcated trial, the trier of fact will find such facts to be true) that will preclude section 2115 from operating, and Nevada law will be the operative body of law to apply to the case.

Hence our conclusion, explained below, that California law applies must be understood as applying *only* in the context of a case coming to us after a demurrer was sustained without leave to amend. Kruss's case against the four defendant directors could, in theory, *ultimately* be decided under Nevada law.

That said, we don't perceive the issue to make much difference as to the core allegations of the complaint. Nevada's law is substantially the same as California's in this most important essential: Neither state allows corporate directors to suck money out of a corporation and siphon it on to themselves or entities they control. (For an example of Nev. law on the point, see *Medical Device Alliance, Inc. v. Ahr* (2000) 116 Nev. 851 [8 P.3d 135] [affirming appointment of receiver over Nev. corporation in the wake of director corruption and self-dealing].)[16]

---

[15] We recognize that in a later pleading a plaintiff cannot "discard" contradictory statements made in an earlier pleading. (E.g., *People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 957 [70 Cal.Rptr.3d 501].) But here, of course, Kruss has never alleged, in any pleading, facts which would contradict the idea that in 2002, Star met the business-voting stock standard.

[16] We have, in this decision from a judgment after a demurrer was sustained without leave to amend, no occasion to explore the precise *scope* of section 2115, or determine, for example, whether there are nuanced differences between California and Nevada law concerning the fiduciary duties of corporate directors. For example, we need not consider in this opinion how sections 204 (which allows for articles of incorporation to put certain limits on director liability

## 2. Basic Operation of Section 2115

This shareholder derivative suit has been filed ostensibly on behalf of VitroTech, a revoked Nevada corporation. Normally then, under section 2116,[17] Nevada law would apply to the internal dealings of the corporation. (See also *Vaughn v. LJ Internat., Inc.* (2009) 174 Cal.App.4th 213, 223 [94 Cal.Rptr.3d 166] ["Corporations Code section 2116 codifies the modern view of the common law doctrine, whereby a court will entertain an action involving the internal affairs of a foreign corporation. With certain exceptions, the law of the state of incorporation applies."].)

■ There is, however, at least a partial exception to the operation of section 2116 to be found in section 2115.[18] While section 2115 is a mass of text,[19] it has been conveniently distilled into this one sentence by the court in

---

that might otherwise be imposed by § 309) or 310 (which allows, under certain conditions, contracts to escape from being void or voidable even though a corporate director may have a financial interest in them) fit into this case, if at all. (Neither § 204 nor 310 is listed in § 2115, and neither have been mentioned in any of the briefing before us.) These issues, if they ever do become relevant, can await another day.

Nor do we have any occasion to consider the more basic question of whether section 2115 would be upheld or applied by, say, the court of another state. (Cf. *VantagePoint Venture Partners 1996 v. Examen, Inc.* (Del. 2005) 871 A.2d 1108, 1114–1115.)

[17] Section 2116 provides in its entirety: "The directors of a foreign corporation transacting intrastate business are liable to the corporation, its shareholders, creditors, receiver, liquidator or trustee in bankruptcy for the making of unauthorized dividends, purchase of shares or distribution of assets or false certificates, reports or public notices or other violation of official duty according to any applicable laws of the state or place of incorporation or organization, whether committed or done in this state or elsewhere. Such liability may be enforced in the courts of this state."

[18] All references to any subdivision not otherwise preceded by a section number from here on in this opinion will be to section 2115.

[19] Here is just subdivision (a) is it presently reads:

"(a) A foreign corporation (other than a foreign association or foreign nonprofit corporation but including a foreign parent corporation even though it does not itself transact intrastate business) is subject to the requirements of subdivision (b) commencing on the date specified in subdivision (d) and continuing until the date specified in subdivision (e) if:

"(1) The average of the property factor, the payroll factor, and the sales factor (as defined in Sections 25129, 25132, and 25134 of the Revenue and Taxation Code) with respect to it is more than 50 percent during its latest full income year and

"(2) more than one-half of its outstanding voting securities are held of record by persons having addresses in this state appearing on the books of the corporation on the record date for the latest meeting of shareholders held during its latest full income year or, if no meeting was held during that year, on the last day of the latest full income year. The property factor, payroll factor, and sales factor shall be those used in computing the portion of its income allocable to this state in its franchise tax return or, with respect to corporations the allocation of whose income is governed by special formulas or that are not required to file separate or any tax

*State Farm Mutual Automobile Ins. Co. v. Superior Court* (2003) 114 Cal.App.4th 434, 448 [8 Cal.Rptr.3d 56] (*State Farm*): "California law governs certain internal affairs of a foreign corporation if more than half of the corporation's voting stock is held by California residents, and the corporation conducts a majority of its business in the state (as measured by assets, payroll, and sales)."[20]

We would add only this introductory clause to that sentence from *State Farm*: "After a certain amount of time has passed, California law governs certain internal affairs of a foreign corporation if . . . ." Pinpointing that amount of time, however, is necessary to figure out which law applies here. And that is going to require us to penetrate the thicket of section 2115's text.

---

returns, which would have been so used if they were governed by this three-factor formula. The determination of these factors with respect to any parent corporation shall be made on a consolidated basis, including in a unitary computation (after elimination of intercompany transactions) the property, payroll, and sales of the parent and all of its subsidiaries in which it owns directly or indirectly more than 50 percent of the outstanding shares entitled to vote for the election of directors, but deducting a percentage of the property, payroll, and sales of any subsidiary equal to the percentage minority ownership, if any, in the subsidiary. For the purpose of this subdivision, any securities held to the knowledge of the issuer in the names of broker-dealers, nominees for broker-dealers (including clearing corporations), or banks, associations, or other entities holding securities in a nominee name or otherwise on behalf of a beneficial owner (collectively 'nominee holders'), shall not be considered outstanding. However, if the foreign corporation requests all nominee holders to certify, with respect to all beneficial owners for whom securities are held, the number of shares held for those beneficial owners having addresses (as shown on the records of the nominee holder) in this state and outside of this state, then all shares so certified shall be considered outstanding and held of record by persons having addresses either in this state or outside of this state as so certified, provided that the certification so provided shall be retained with the record of shareholders and made available for inspection and copying in the same manner as is provided in Section 1600 with respect to that record. A current list of beneficial owners of a foreign corporation's securities provided to the corporation by one or more nominee holders or their agent pursuant to the requirements of Rule 14b-1(b)(3) or 14b-2(b)(3) as adopted on January 6, 1992, promulgated under the Securities Exchange Act of 1934, shall constitute an acceptable certification with respect to beneficial owners for the purposes of this subdivision."

[20] See also *Greb v. Diamond Internat. Corp.* (2010) 184 Cal.App.4th 15, 26, footnote 8 [108 Cal.Rptr.3d 566], albeit it needed about five sentences: "To come within the purview of Corporations Code section 2115, a foreign corporation must meet two prerequisites. First, it must transact more than one-half of its business in California. Second, more than one-half of the corporation's voting securities must be held by persons with California addresses. If section 2115 applies, California law is deemed to control such matters as the annual election of directors, the directors' standard of care, limitations on corporate distributions in cash or property, the requirement for annual shareholders' meetings and remedies for the same if not timely held, limitations on the sale of assets, dissenters' rights, records and reports, actions by the Attorney General and inspection rights."

The structure of section 2115 is somewhat convoluted, reflecting, alas, a devotion to cross-referencing worthy of the Internal Revenue Code. The statute begins, in subdivision (a), with the thought that on a certain date, as defined in subdivision (d), and until a certain date, as defined in subdivision (e), an out-of-state corporation "is subject to" certain requirements, which are spelled out in subdivision (b), if two tests, enumerated in subdivision (a)(1) and (2), are met.

■ So we begin with the question, what exactly *are* "the requirements of section 2115, subdivision (b)?" Answer: Those requirements are the need to conform to certain kinds of *internal* corporate behavior as delineated in specified sections of the Corporations Code,[21] including, of course, a standard

---

[21] Subdivision (b) states in its entirety:

"(b) Except as provided in subdivision (c), the following chapters and sections of this division shall apply to a foreign corporation as defined in subdivision (a) (to the exclusion of the law of the jurisdiction in which it is incorporated):

"Chapter 1 (general provisions and definitions), to the extent applicable to the following provisions;

"Section 301 (annual election of directors);

"Section 303 (removal of directors without cause);

"Section 304 (removal of directors by court proceedings);

"Section 305, subdivision (c) (filling of director vacancies where less than a majority in office elected by shareholders);

"Section 309 (directors' standard of care);

"Section 316 (excluding paragraph (3) of subdivision (a) and paragraph (3) of subdivision (f)) (liability of directors for unlawful distributions);

"Section 317 (indemnification of directors, officers, and others);

"Sections 500 to 505, inclusive (limitations on corporate distributions in cash or property);

"Section 506 (liability of shareholder who receives unlawful distribution);

"Section 600, subdivisions (b) and (c) (requirement for annual shareholders' meeting and remedy if same not timely held);

"Section 708, subdivisions (a), (b), and (c) (shareholder's right to cumulate votes at any election of directors);

"Section 710 (supermajority vote requirement);

"Section 1001, subdivision (d) (limitations on sale of assets);

"Section 1101 (provisions following subdivision (e)) (limitations on mergers);

"Section 1151 (first sentence only) (limitations on conversions);

"Section 1152 (requirements of conversions);

"Chapter 12 (commencing with Section 1200) (reorganizations);

"Chapter 13 (commencing with Section 1300) (dissenters' rights);

"Sections 1500 and 1501 (records and reports);

"Section 1508 (action by Attorney General);

"Chapter 16 (commencing with Section 1600) (rights of inspection)."

of care imposed on corporate directors, requiring them to act in good faith in the best interests of the corporation as an ordinary prudent person would under similar circumstances.[22]

We have already met, in the *State Farm* court's encapsulation, the tests enumerated in subdivision (a)(1)—which is, roughly speaking, half or more of the corporation's business[23]—and subdivision (a)(2)—which is, exactly speaking, more than half the voting stock.[24] For convenience we will call these tests the "business-voting stock" standard.

We say "roughly speaking" for the business element in subdivision (a)(1) because, in order to determine whether half or more of the corporation's business is being done in California, you have to look at the corporation's tax

---

[22] The good faith requirement is in section 309, which provides in its entirety:

"(a) A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

"(b) In performing the duties of a director, a director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following:

"(1) One or more officers or employees of the corporation whom the director believes to be reliable and competent in the matters presented.

"(2) Counsel, independent accountants or other persons as to matters which the director believes to be within such person's professional or expert competence.

"(3) A committee of the board upon which the director does not serve, as to matters within its designated authority, which committee the director believes to merit confidence, so long as, in any such case, the director acts in good faith, after reasonable inquiry when the need therefor is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted.

"(c) A person who performs the duties of a director in accordance with subdivisions (a) and (b) shall have no liability based upon any alleged failure to discharge the person's obligations as a director. In addition, the liability of a director for monetary damages may be eliminated or limited in a corporation's articles to the extent provided in paragraph (10) of subdivision (a) of Section 204."

Section 309 is considered a codification of the business judgment rule. As stated in *Bader v. Anderson* (2009) 179 Cal.App.4th 775, 787–788 [101 Cal.Rptr.3d 821]: "As codified in section 309, the business judgment rule obligates a director to perform his or her duties 'in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances' (§ 309, subd. (a)); and it insulates a director from liability when he or she performs those obligations in the manner provided in the statute (§ 309, subd. (c)).' "

[23] Subdivision (a)(1) provides: "(1) The average of the property factor, the payroll factor, and the sales factor (as defined in Sections 25129, 25132, and 25134 of the Revenue and Taxation Code) with respect to it is more than 50 percent during its latest full income year and [then goes on to subdivision (a)(2)]."

[24] Subdivision (a)(2) provides in part: "(2) more than one-half of its outstanding voting securities are held of record by persons having addresses in this state . . . ."

returns. Yet another cross-reference in subdivision (a)(1) are to those provisions in California's Revenue and Taxation Code that subdivide "business" into the factors of property, payroll and sales.[25]

The need to look at tax returns (or, more exactly, the data that goes into the tax returns), plus common sense, dictates that the applicability of California law to a given action by the board of an out-of-state corporation can only kick in after a certain time lag.[26] In a close case, for example, a corporation wouldn't know whether its property, payroll and sales added up to doing more than half its business in California until its tax returns were finalized.

Additionally, there is the fact that stock may change hands instantly, but records may not instantaneously reflect that change. Thus subdivision (a)(2) of section 2115 refers the reader to address records of stockholders on either the record date for the last shareholders' meeting or the last day of the "latest full income year," which, of course, may be yet in the future.[27]

---

[25] Subdivision (a)(1) provides in pertinent part: "(a) A foreign corporation . . . is subject to the requirements of subdivision (b) commencing on the date specified in subdivision (d) and continuing until the date specified in subdivision (e) if: [¶] (1) The average of the property factor, the payroll factor, and the sales factor (as defined in Sections 25129, 25132, and 25134 of the Revenue and Taxation Code) with respect to it is more than 50 percent during its latest full income year [and finishes the sentence by noting the voting stock factor]."

The statute then goes on to elaborate on the elements of the amount of business done in California: "The property factor, payroll factor, and sales factor shall be those used in computing the portion of its income allocable to this state in its franchise tax return or, with respect to corporations the allocation of whose income is governed by special formulas or that are not required to file separate or any tax returns, which would have been so used if they were governed by this three-factor formula. The determination of these factors with respect to any parent corporation shall be made on a consolidated basis, including in a unitary computation (after elimination of intercompany transactions) the property, payroll, and sales of the parent and all of its subsidiaries in which it owns directly or indirectly more than 50 percent of the outstanding shares entitled to vote for the election of directors, but deducting a percentage of the property, payroll, and sales of any subsidiary equal to the percentage minority ownership, if any, in the subsidiary."

[26] Except in this footnote, we will deliberately avoid the phrase "trigger date," which is used by the parties and at least one court in explicating section 2115. The problem is: Given the multiple timeframes found in section 2115, the phrase "trigger date" is, at the very least, counterintuitive. Do you mean the date when the business-voting shareholder test of section 2115, subdivision (a) is first satisfied, or (more logically) do you mean the date when California law first applies to director conduct? While it is more of a mouthful, it is cleaner to speak of the first date when California law *is applicable* to board action.

[27] Hence the beginning of subdivision (a)(2), which is really only a continuation of a sentence begun in subdivision (a)(1), provides: "more than one-half of its outstanding voting securities are held of record by persons having addresses in this state appearing on the books of the corporation on the record date for the latest meeting of shareholders held during its latest full income year or, if no meeting was held during that year, on the last day of the latest full income year."

The precise point at which California internal-governance law applies *if* the business-voting stock standard is met is itself the subject of yet more intricacy. Subdivision (a) cross-references to subdivision (d) on this point. Subdivision (d) says—we'll take a stab at a plain English paraphrase—that if there is a year in which "the tests referred to in subdivision (a) have been met" (i.e., business-voting stock standard), you wait 135 days into the next income year, and the very first day of the income year *after that one* is the one in which the directors are now subject to California law.[28] In short, the lag time can be around three years.

Fortunately, there is a plain English case from the United States Bankruptcy Court, *In re Flashcom, Inc.* (2004) 308 B.R. 485 (*Flashcom*) that illustrates the operation (and length) of this time lag. The core issue in *Flashcom* was whether California or Delaware law applied to an act of alleged director malfeasance—an improper $9 million stock redemption—that took place on February 23, 2000. While the corporation began life in Nevada in May 1998, it had been reincorporated in Delaware in January 1999. So, under the normal operation of section 2116 (sometimes called the "internal affairs doctrine") Delaware law would apply to the internal affairs of the corporation. Even so, from the beginning half its business was in California. (308 B.R. at p. 487.)[29] Thankfully (for future readers of the *Flashcom* opinion), the corporation used the standard calendar year as its fiscal year.

To decide the case, however, the Bankruptcy Court had to ascertain the nature of reference to the phrase "full income year" as used in subdivision (d). (See *Flashcom, supra*, 308 B.R. at p. 488.) The defendants argued that the term "full income year" meant a full calendar or fiscal year. Thus, under their theory, the first year in which the two tests of business-voting stock were met was 1999 (not the partial year 1998), so "the 135-day count" began

---

[28] Law professors in substantive classes often tell their students not to paraphrase statutes—stick to the exact language, the paraphrase, after all, is not "the law," the actual text of the statute is. The problem is: Human beings usually don't *think* in statutes, and probably *no one ever* thought in the sort of language in which section 2115 is framed. (Then again, legal writing professors sometimes tell their students to not quote long swaths of relevant statutes or contract language. They forget that the law (or contract) is the actual text itself, not any paraphrase or snippet.)

Here is the exact text of subdivision (d): "For purposes of subdivision (a), the requirements of subdivision (b) shall become applicable to a foreign corporation only upon the first day of the first income year of the corporation (1) commencing on or after the 135th day of the income year immediately following the latest income year with respect to which the tests referred to in subdivision (a) have been met or (2) commencing on or after the entry of a final order by a court of competent jurisdiction declaring that those tests have been met."

[29] The court seemed to assume that more than half the voting stockholders lived in California as well.

January 1, 2000, and the first day of the next full income year after the year in which the 135-day count expired—2001—was the date of first applicability of California law. According to the defendants, then, California law did not apply to the stock redemption in February *2000*.

The bankruptcy trustee, by contrast, wanted the partial year 1998 to be the first year in which the two tests were met, hence the 135 days began running on January 1, 1999, and the beginning of the next year following the year in which the 135 days expired—2000—would be the year of first applicability of California law.

The *Flashcom* court reasoned that "the only workable definition of 'full income year' as used" in section 2115 "is a full calendar or fiscal year." (*Flashcom, supra*, 308 B.R. at p. 489.) Besides which, said the court, an out-of-state corporation couldn't tell if it was doing half its business in California "without data from a full fiscal or calendar year." (*Ibid.*) Thus:

(a) the corporation's "first full fiscal year," which was its " 'full income year,' " was 1999;

(b) 1999 was the first year of satisfaction of the more-than-half-the-business-in-California test;

(c) therefore the 135 days began running the next full year, or on January 1, 2000;

(d) the 135 days expired in May 2000; so

(e) 2001 was the " 'first income year' " after the 135 days expired; meaning

(f) January 1, 2001, was the first day on which California law became applicable to the affairs of the corporation. (*Flashcom, supra*, 308 B.R. at p. 489.)

And the January 1, 2001 date-of-first-applicability was *after* the dubious February 2000 stock redemption. Hence Delaware law applied to the redemption, and the defendants were entitled to judgment in their favor on the various claims brought against them under the California Corporations Code statutes. (*Flashcom, supra*, 308 B.R. at p. 490.)

■ To recap the operation of section 2115: Take the first full year in which the business-voting stock standard for an out-of-state corporation is met—year 1; then, in the next full year—year 2—count 135 days; and then finally, the very first day of the next full year, year 3, is the very first day which California internal affairs law applies to that out-of-state corporation.

### 3. *As Applied to the Case Before Us*

Star—the public shell that swallowed Hi-Tech's spinoff in the form of VitroCo (which was itself eaten by VitroTech) was alleged to have been incorporated in Nevada on July 16, 2001. There is no dispute about that, nor is there any dispute that, like the corporation in *Flashcom*, Star used the standard calendar year as its fiscal year.[30] As shown above, the first amended complaint (itself supported by a request for judicial notice of Star's tax return for 2002) alleged that *in 2002* more than half of Star's voting shareholders and all of its business were in California. That is, *under the facts alleged*, in 2002 the business-voting stock tests were met.[31]

Under the section 2115 formula, then: 2002 was year 1; the 135 days expired in May of 2003 (year 2); and therefore January 1, 2004 (first day of year 3), was the date of first applicability of California law to the internal affairs of the corporation. The date of the reverse merger was February 3, 2004. Therefore, for purposes of a demurrer to the complaint, California law applied to the reverse merger.

But this case presents anything but a straight path, and we're not quite out of the dark woods yet. As noted above, there may come a time when California law ceases to apply to an out-of-state corporation's internal affairs. That time is delineated in subdivision (e), which provides: "(e) For purposes of subdivision (a), the requirements of subdivision (b) shall cease to be applicable to a foreign corporation (1) *at the end of the first income year of the corporation immediately following the latest income year with respect to which at least one of the tests referred to in subdivision (a) is not met* or

---

[30] In their briefs in this appeal, both sides assume that, for purposes of section 2115, it is Star that is the relevant corporate entity. (Again—deciding § 2115 issues on demurrer may not be the best use of judicial resources.) So we temper our analysis with this comment: Our decision today is based on that presentation of the issues in this appeal. It may well be, for example, that *Hi-Tech* (which, after all, had the assets that made the whole idea of going public with VitroTech plausible) is the substantive entity. But the trial court will have miles to go before that problem must be tackled.

[31] The defendant promoters argue that SEC filings show otherwise for 2002. We emphasize again we deal with the case on demurrer; the dispute *at this stage* goes to plaintiff.

(2) at the end of the income year of the corporation during which a final order has been entered by a court of competent jurisdiction declaring that one of those tests is not met, provided that a contrary order has not been entered before the end of the income year." (Italics added.)

Subdivision (e) thus creates yet one more beastly problem, and unfortunately one in which we do not have a solid bankruptcy decision to guide us, Virgil-like, down through its multiple rungs of analysis: Respondent defendant directors argue on appeal that, regardless of the situation in 2002,[32] in *2003*—as shown by SEC filings of which the trial court took notice (a form 10KSB)—Poland sold off about half his 67 percent interest to various investors outside of California. For what it's worth, in his own briefing plaintiff Kruss implicitly concedes that *by 2003* at least the voting-stock part of the business-voting stock standard could not be satisfied.

Subdivision (e) says that California internal affairs law ceases to be applicable "at the end of the first income year of the corporation immediately following the latest income year with respect to which at least one of the tests referred to in subdivision (a) is not met." That is, you have "the latest income year with respect to which at least one of the tests referred to in subdivision (a) is not met"—here, that would be 2003 (year 1)—and then applicability ceases "at the end of the first income year"—year 2—"of the corporation immediately following" that income year. So, here, on the assumption that 2003 was year 1, then the end of year 2, 2004, that is, December 31, 2004, was the date of the end of the applicability of California internal affairs law.

■ Conclusion: for the year 2004—which includes the February 2004 reverse merger and the next 11 months or so—and again, *for purposes of review on demurrer*—California law applied to the internal workings of the corporation formerly known as Star, and which, *for purposes of this appeal*, we treat as the correct entity on which to test the applicability of section 2115 to VitroTech, on behalf of which this shareholder derivative action has been filed.[33]

Consequently, there is no doubt but that Kruss must be given leave to amend his complaint to allege (or, precisely speaking, reallege) the applicability of California law.

---

[32] Actually, they argue that it also applies to 2002, but on that year, as noted above, the discrepancy goes to the complaint, not the demurrer.

[33] And to make it clear: If it is later established that the business-voting stock standard did not apply in 2002, the case goes back to being governed by Nevada internal affairs law.

## IV. THE MERITS

But our deliberations cannot stop here. There are a few more rungs to be explored. If the trial court was correct that Kruss had alleged no postreverse merger self-dealing conduct, allowing an amendment to allege applicability of California law wouldn't make any difference. We would still be required to affirm the judgment, as it would be correct under California law in any event.

### A. The Prereverse and Postreverse Merger Problem

The trial court's rationale was that Kruss could not "rely" on any facts alleged to have occurred prior to February 3, 2004, i.e., the date of reverse merger, because Kruss was not a shareholder, and the four defendant directors were not directors, prior to that date.

The answer to the trial court's rationale is: yes and no. Yes, in the strict sense that no corporate action taken by directors of Hi-Tech or the mining companies truly prior to the reverse merger of February 2004 can, *by itself*, establish liability to Kruss (or like investors) for a breach of fiduciary duty. In a word, Kruss never owned any part of Hi-Tech or the mining companies.

■ Section 800 embodies what is often called the contemporaneous ownership rule, which can be reduced to this sentence: A plaintiff must be a shareholder in the corporation on whose behalf the plaintiff has brought the derivative suit, and have been a shareholder at the time the corporation's claim arose. Here, Kruss did not own any stock until VitroTech was created in the reverse merger. And under the contemporaneous ownership rule the derivative suit cannot be based on premerger events. (See *Daly v. Yessne* (2005) 131 Cal.App.4th 52, 61–62 [31 Cal.Rptr.3d 420] [plaintiff had no standing because the events of which she complained "all took place before plaintiff acquired her shares"].)

However, section 800 is also home to an *exception* to the contemporaneous ownership rule, which allows a plaintiff to bring a derivative action where the previous misconduct and its bad effects continue over into the period after the plaintiff acquired the stock. (See generally Wells, *Maintaining Standing in a Shareholder Derivative Action* (2004) 38 U.C. Davis L.Rev. 343, 346 (hereinafter, Wells, *Maintaining Standing*) ["This doctrine allows standing if plaintiffs can show that the previous misconduct and its negative effects continued after the acquisition of the stock."].)

Though the question of whether section 800 embodies the continuing wrong doctrine appears to be one of first impression in our state's case law, commentators have taken the position that section 800 does indeed do so. (Wells, *Maintaining Standing, supra*, 38 U.C. Davis L.Rev. at p. 351 [grouping Cal., Pa. and Ohio as states that "have explicitly or implicitly adopted the continuing wrong doctrine"].)

The basis of the assertion that California has explicitly adopted the continuing wrong doctrine is this language taken from subdivision (b)(1) of section 800, which, after an iteration of the contemporaneous ownership rule, states: "provided, that any shareholder who does not meet these [contemporaneous ownership] requirements may nevertheless be allowed *in the discretion of the court* to maintain the action *on a preliminary showing to and determination by the court*, by motion and after a hearing, at which the court shall consider such evidence, by affidavit or testimony, as it deems material, that . . . (iii) the plaintiff acquired the shares *before there was disclosure* to the public or *to the plaintiff of the wrongdoing of which plaintiff complains*." (Italics added.)

But this language in section 800 brings us to yet another rung of complication: As the quoted language shows, the continuing wrong exception of section 800 requires a hearing, with evidence, and the actual application of the exception is left to the court's discretion.

However, plaintiff Kruss sought no such hearing under section 800. We therefore cannot, bound by the procedural posture of this case, simply declare that all the premerger malfeasance engaged in by defendants alleged in this complaint is enough to overturn the trial court's judgment. As the case comes to us, the contemporaneous ownership rule remains the operative one, without the application of the discretionary exception in section 800 for continuing but undisclosed wrongs. Any discretionary application of the continuing wrong doctrine by the trial court and its review on appeal is a problem that must await another day.

Even so, the contemporaneous ownership rule does not make facts alleged to have taken place prior to the reverse merger ipso facto *irrelevant* as to facts alleged to have taken place *after* the reverse merger. Those premerger facts simply cannot, by themselves, support claims of breaches of fiduciary duty in a shareholder derivative suit based on stock acquired only *in* the reverse merger or thereafter.

■ Complaints, as our Supreme Court explained in *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58], must be given "a reasonable interpretation." They must be read "as a whole" with their "parts in their context."

Here, we can understand the nature of board malfeasance after the merger by recognizing *a context shaped by premerger events*. Read as a whole and in context, the second complaint tells the story of a remarkable twist on pump and dump schemes:

You take a real company with real assets (here, Hi-Tech) which is part of a group of companies, including raw materials suppliers (the mining companies). From this real company (Hi-Tech), you spin off an entity which is supposed to embody certain profitable operations (VitroCo). But then, in the course of a reverse merger, you put a shell (VitroTech as the incarnation of the public Star) on top of the newly born spinoff (VitroCo), and simultaneously—shell games require sleight of hand, remember—lard up the shell (VitroTech) and the supposedly profitable pea under it (VitroCo) with obligations to the original mother company (Hi-Tech) as well as to the raw materials suppliers that you conveniently control. Then you take money from investors who think they are buying into the profitable pea (VitroCo), and arrange for that money to be dissipated in a series of sweetheart deals with yourself, i.e., the companies (Hi-Tech and the mining companies) you control. It's a clever scheme, but it should be clear to any outsider (like a court) that all the actions taken to implement the plan *after* the reverse merger are still self-evidently a breach of fiduciary duty to the investors who were led to believe that the spinoff was itself supposed to be profitable and not just a conduit for their money to go to your entities.

The upshot is (again, for the time being and independent of any hypothetical future attempt by Kruss to seek the court's discretionary imprimatur to allow him and his like investors to be excused from the contemporaneous ownership rule): Actions taken by the four defendant directors *after* the reverse merger can still support the derivative suit, particularly as those actions are understood as part of a larger scheme to use VitroTech to siphon money to entities controlled by the four defendant directors.

Allegations of postreverse merger hanky-panky on the part of the board, as spelled out in paragraph 270 of the second amended complaint, include:

—agreeing to an "onerous" royalty structure and minimum requirement contracts with Hi-Tech and the mining companies, also allegedly controlled by the four defendant directors, and then failing to even try to renegotiate those contracts (par. 270f);

—having VitroTech assume $14.5 million of Hi-Tech's debt (par. 270h);

—failing to assure that assets that were supposed to be transferred from Hi-Tech to VitroCo (and thus effectively VitroTech) actually were transferred (par. 270i);

—approving amendments to the mining contracts that resulted in VitroTech shares being transferred to Hi-Tech and the mining companies in exchange for valueless or near valueless royalty concession (par. 270m); and

—having VitroTech buy a milling facility from Hi-Tech at double the price Hi-Tech paid for it just two months before (par. 270q).[34]

The four defendant directors' responses to these postmerger instances of alleged self-dealing fall into several categories, all of which are at odds with the basic procedural posture of deciding a case on demurrer: Either they say (a) well, it happened, but not after the merger (like the assumption of the debt); or (b) if it did happen after the merger (like paying too much for the milling facility), it was just an improvident business decision; or (c) there's no intentional misconduct fraud or knowing violation of law.

Well, those may be valid defenses in other procedural contexts, but on demurrer, the reasonable inferences are drawn in favor of the complaint. And it is very reasonable here to draw an inference that the four defendant directors used the reverse merger form to implement a general plan to take the investors' money and send it to themselves in the form of non-arms-length deals with companies they controlled.

## B. The Business Judgment Rule

The second and main substantive reason the trial court sustained the demurrer without leave to amend was the idea that everything in the complaint was covered by the business judgment rule.

---

[34] Obviously, we have omitted a number of allegations, some of which do not, on their face, seem to implicate anything other than bad (as distinct from corrupt) management (e.g., failing to increase sales of vitrolite by maintaining an unrealistic price). We leave it to future proceedings to sort out which of the ones we don't mention are insufficient. The ones we *do* mention, however, support claims for breach of fiduciary duty based on self-dealing.

■ The business judgment rule is essentially a presumption that corporate directors act in good faith. As explained by the court in *Everest Investors 8 v. McNeil Partners* (2003) 114 Cal.App.4th 411, 429–430 [8 Cal.Rptr.3d 31] (*Everest Investors 8*): "The business judgment rule is a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions. . . . 'The rule establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest.' "[35] (Citation omitted.)

An important exception to the business judgment rule arises when circumstances inherently raise an inference of conflict of interest. As the court in *Everest Investors 8* went on to explain: "*An exception to this presumption exists in circumstances which inherently raise an inference of conflict of interest.* . . . The business judgment rule does not shield actions taken without reasonable inquiry, *with improper motives, or as a result of a conflict of interest.*" (*Everest Investors 8, supra,* 114 Cal.App.4th at p. 430, italics added, citation omitted.)

Here, there are circumstances aplenty that raise an inherent inference of conflict of interest: Hi-Tech and the mining companies were all allegedly under the control of at least three of the four defendant directors (Booth, Kangas, and Easterbrook). On top of that, there are the postmerger actions we have just noted. Defendant directors had VitroTech assume $14.5 million of Hi-Tech's debt. Defendant directors failed to assure actual transfer of assets from Hi-Tech to VitroTech, but they did transfer VitroTech stock to Hi-Tech and the mining companies. On top of all that, they had VitroTech buy a milling facility from Hi-Tech at an inflated price. These *postmerger* decisions on the part of the four defendant directors readily raise an inference of self-dealing, improper motive, and conflict of interest.[36]

---

[35] Nevada has the same rule. (See *Shoen v. SAC Holding Corp.* (2006) 122 Nev. 621, 632 [137 P.3d 1171] ["The business judgment rule is a 'presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.' "].)

[36] One of the dangers of winning on demurrer is that you are stuck, on appeal, with your opponent's version of the facts, and those facts can be highly critical of you indeed. (E.g., *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 571 [108 Cal.Rptr. 480, 510 P.2d 1032] [Supreme Court accepted as true for purposes of review that defendants "joined together and acted in concert to falsely imply that the plaintiff had a motive to deliberately set fire to and burn down his place of business" to avoid an insurer from having to pay a fire claim].) We reiterate again that this case comes to us on demurrer, so the allegations of self-dealing set forth in the complaint must be accepted as true.

### C. Miscellaneous Causes of Action

#### 1. *Aiding and Abetting*

 Both California and Nevada law provide for aiding and abetting liability when board directors are aware that a fellow board director has violated a fiduciary duty to the shareholders, and knowingly and substantially assist in that breach. (Compare *Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1144 [26 Cal.Rptr.3d 401] with *G.K. Las Vegas Limited Partnership v. Simon Property Group, Inc.* (D.Nev. 2006) 460 F.Supp.2d 1246, 1261.) Since the complaint alleges postmerger actions showing a breach of fiduciary duty, and the complaint also treats the four defendant directors as entirely united in those actions, plus alleges they were self-interested in those actions, it is a reasonable inference that each of the directors knowingly and substantially assisted in those breaches.

#### 2. *Civil Conspiracy*

What we have just said also applies equally to the civil conspiracy claim. The complaint is susceptible of the reasonable inference that the four defendant directors contrived to send assets from VitroTech to their own firms in breach of their fiduciary duties to the shareholders.

#### 3. *Unjust Enrichment, Accounting, and Constructive Trust*

What we have said above about the breach of fiduciary duty and self-dealing applies to the remaining three causes of action for unjust enrichment, accounting and constructive trust. The four defendant directors here assert:

(a) Certain transfers occurred prior to the merger. This fails because, in the context of a demurrer, it is mere wishful thinking—substituting one's own facts in place of those alleged in the complaint.

(b) Other transfers occurred after October 2004 when the four defendant directors left the board. This fails because it ignores defendant directors' continued alleged interest in Hi-Tech and the mining companies. It also ignores the commonsense inference that one can arrange, while one is on a board of directors, to have a self-interested deal consummated after one has resigned the corporate directorship.

(c) The property from VitroTech didn't, strictly speaking, end up in the hands of any of the four defendant directors. This argument fails because it ignores the allegations that defendant directors were beneficially interested in the companies where the property *did* end up.

## V. DISPOSITION

The judgment of dismissal is reversed. Appellant shall recover his costs on appeal.

Moore, J., and Fybel, J., concurred.

On July 9, 2010, the opinion was modified to read as printed above.